## LOUISVILLE CEMENT CO. v. UNITED STATES et al.

### No. 1088.

District Court, W. D. Kentucky, at Louisville.

July 8, 1937.

J. V. Norman and Norman, Quirk & Graham, all of Louisville, Ky., for petitioner.

Elmer B. Collins, Sp. Asst. to Atty. Gen., Robert H. Jackson, Asst. Atty. Gen., and Bunk Gardner, U. S. Atty., of Louisville, Ky., for the United States.

Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., for Interstate Commerce Commission.

Before HICKS, Circuit Judge, and HAMILTON and FORD, District Judges.

PER CURIAM.

This is a suit brought under the Act of October 22, 1913, 38 Stat. 219, 28 U.S. C.A. §§ 41(28), 45, 46, 47 (amending Act

June 18, 1910, 36 Stat. 539), to enjoin an order of the Interstate Commerce Commission requiring the Pennsylvania Railroad to discontinue payment of allowance to the plaintiff for the performance of certain terminal services commonly called "spotting."

The questioned order of the Interstate Commerce Commission was entered in a proceeding entitled Ex Parte 104, Practices of Carriers Affecting Operating Revenues or Expenses, Part II, Terminal Allowance, 209 I.C.C. 11, and Louisville Cement Company Terminal Allowance, Ex Parte 104, 210 I.C.C. 293, and upon further hearing same subject decided February 1, 1937, 220 I.C.C. 88.

The plaintiff is engaged in the manufacture of cement of two kinds, Portland and Brixment or natural. Its plant is located at Speeds, Ind., and is the sole industry at that place. It is served by the Pennsylvania Railroad, and the Indiana Electric Railroad System, the latter connecting with the Baltimore & Ohio Railroad a considerable distance from the plant. The facts material to a decision are as follows:

The plant is divided into two units. Portland cement is manufactured at one and Brixment or natural at the other. These units occupy the same industrial area, and each is served by disconnected spur tracks located within the plant of the industry. The main line of the Pennsylvania parallels the plant property on the west side with five interchange tracks, two used for inbound cars, two for outbound loaded cars and empties, and the fifth, nearest the plant, for a run-around. The Pennsylvania built these tracks for the exclusive use of the industry. There is another spur track referred to in the record as "U. S. Switch," which extends in a northeasterly direction from the south end of the interchange tracks. Empty cars are placed by the Pennsylvania on the spur when clear; otherwise on the interchange tracks, from which they are moved by the industry to the U. S. Switch, where cleaned and coopered by the Pennsylvania and then moved by the plant locomotive. The industry built on its property a switching system of 12 tracks, aggregating 2 miles in length, with approximately four loading and eight unloading points in the Portland unit, and two loading and two unloading in the natural unit. Cars are moved between the interchange tracks and the points of loading and unloading within the plant property by the industry.

The Portland unit is served by several tracks extending north and south, which lead to a connection with the Pennsylvania, known as track 6, located at the southern end of the interchange tracks described and numbered in the record from 1 to 9. Track 1, 1,880 feet in length, serves three points in the Portland unit at which mill supplies, empty bags, and other brands of cement and lumber are unloaded. Tracks 2, 3, and 4, ranging from 1,900 to 1,950 feet in length, each of which has a capacity for 6 cars, serve four loading points for Portland cement. If necessary, track 2 and 3 can be lengthened to hold five or three more cars, respectively. Tracks 7, 8, and 9 are short stub-end tracks and seldom used. Track 6 connects with interchange tracks, and tracks 1, 2, and 3 diverge therefrom, and all other tracks diverge from tracks connecting with track 6. The distances from the Pennsylvania connection to the ends of the tracks serving this unit range from 1,120 to 2,200 feet.

The natural cement or Brixment unit located in the northwestern part of the plant is served by several tracks numbered in the record from 10 to 15. Track 10 extends for a distance of 1,500 feet from the interchange track with which it directly connects. Track 14, with a capacity of 2 cars, diverges near its terminus and serves the coal building. Delivery on this latter track requires a reverse movement. Also connecting with track 6 are track 13, with a capacity of 5 cars, and track 12, with a capacity of 6 cars, on which empty cars are placed for loading with Brixment or natural cement. Tract 11, 320 feet in length, serves the storage house and parallels the Pennsylvania passing track. Track 15 serves the engine house, parallels track 12, and connects with track 10. There is also one point on a Pennsylvania track, which parallels track 12, used for unloading oil and grease. There is no intertrack connection between the two units. The industry owns between 15 and 20 miles of narrow gauge track serving its plant and quarries, which do not interfere with operations over the other tracks.

The standard-gauge tracks do not cross one another. The movement to each loading or unloading point is direct, except as

to two points seldom used, one in each plant unit, and when used require reverse movements. This is avoided if two or more parallel tracks are served in one movement from or to the interchange tracks; a reverse movement occurring in this way on the interchange. Where more than one car is placed on a track for loading or unloading, and used, it is moved, and the next car shifted to the exact point for such operation either by gravity or by an electric-power car puller. The industry owns one 45-ton and one 60-ton locomotive, standard gauge, only one of which is used at a time.

The plant was originally at Smithville, Ind., about 3.5 miles south of its present location, but has been at Speeds for many years. Jeffersonville, Ind., is about 7 miles south of Speeds, and is the base yard for Pennsylvania switch engines in that territory. When the plant was located at Smithville, all switching service was performed by the Pennsylvania, but, when moved to Speeds, the industry purchased two locomotives, and because of quicker service it performed all movments. of cars between the interchange tracks and the points of loading and unloading within the plant. The Pennsylvania performed no spotting service at this plant. On July 7, 1927, after conferences between the company and the Pennsylvania, a formal application was made that the railroad perform the spotting service. The application made by the industry contained, among other statements, the following: "In taking over this work and performing the service with your own crew, I want to again impress upon you that neither the Pennsylvania nor the Louisville Cement Company can offer to do anything that will in any way slow up the present service, the service being one of our strong talking points in the sale of our products."

The Pennsylvania Railroad wished to avoid performing the terminal service if suitable arrangements could be made for the industry to continue it. The Central Freight Association Lines was requested to make a cost study for the purpose of determining the proper allowance to the industry for spotting service, which study was conducted over a ten-day period August 11 to August 20, 1927. The test service was made by the industry's locomotives as customarily used. The association found that 5,665 minutes were devoted to the entire switching service, and of this,

2,996 minutes, or 52.89 per cent., were charged to interchange service and 394 loaded cars were handled, while 2,669 minutes, or 47.11 per cent., were charged to intraplant service. About 5 hours per day were used in interchange service moving an average of 39 loaded cars per day, with an average of 15 switching movements to and from interchange tracks. The hours were not continuous but spread over an average period of 9.5 hours. The association found the cost of the switching service, both interchange and intraplant, from July 1, 1926, to June 30, 1927, to be $18,237.32, $17,763.82 being for expenses; $236.75 for depreciation at 5 per cent., and the same amount for interest at 5 per cent. on the original cost of the locomotive, which was $4,735. Of the total time devoted, 52.89 per cent. was to interchange service, and this percentage was applied to the total cost for the entire year. The $9,645.72 arrived at was then divided by the total number of cars handled during the year, 10,271, and the resulting figure, 94 cents per loaded car, was reached as the amount of the allowance to which the plaintiff was entitled for performing the spotting service. The amount shown above for expenses consisted of wages of $2,769 for the engineers, $1,599.53 for firemen, $2,092.80 for conductors, and $1,741 for brakemen, $2,691.87 for coal, $50.28 for water, $53.01 for oil, waste, and other supplies, and $6,766.23 for repairs to the locomotive. Expenses included wages of four men; the industry now employs three, and since the original investigation wages have considerably increased. In the association's investigation, the cost of repairs to locomotives annually exceeded original cost.

If the Pennsylvania was moving the cars under its line haul charge, it would not make as many separate movements as made by the industry, and in the busy season would make car movements by the use of an engine from the Jeffersonville yards to the plant bringing them from it to the yards for classification. If the railroad should perform the service as now done by the industry, it would cost more than 94 cents a car.

As the plant is now operated, and the interplant track used, the Pennsylvania would encounter interference in interplant switching, which cannot be eliminated while mixed shipments are loaded in the same car from disconnected tracks, and also so long as cars are weighed on sid-

ings for billing purposes. Interference would be eliminated if cars of mixed shipments were loaded either by truck transportation or underground piping under pressure, and track weighing discontinued.

For the month of February, 1935, 133 cars of unmixed cement were moved out of the plant, and 54 mixed; 28 carloads of coal and 3 of commodities moved in. During October, 1935, 361 cars of unmixed cement were moved out of the plant and 128 mixed. 118 cars of coal and 17 of miscellaneous moved in. These two months represent a busy and slack season. In every shipment of mixed cement, interplant switching is necessary as the work is now done, and would not be covered in a line haul charge. The number of cars shipped over the Pennsylvania has decreased since 1929. During that year, it transported 11,884 inbound and outbound cars, and in 1935, 5,242. The decrease is attributed to two factors; less use of the product, and shipment over the Indiana Railroad & Electric Line connecting with the Baltimore & Ohio Railroad Company at Watson, Ind. This road transported 1,116 outbound cars during 1935 and the Pennsylvania 4,049. The cement is loaded into the cars of the Indiana Railroad at a loading plant, disconnected from the units of the industry, the cement being pumped from the mill through an underground pipe, the loading tracks accommodating two cars. Adjacent to them are storage tracks with four-car capacity. The electric line does the switching at its loading tracks as a part of its line haul charge, and keeps a locomotive there during the entire period of loading, which requires about 45 minutes to a car. The electric locomotive transports loaded cars to Jeffersonville, Ind., and brings empties from Watson. The standby service of the electric line is in excess of that required of carriers under their line haul charge.

The Pennsylvania tariff, I.C.C. 1504, provides in rule 15, under the heading "Facilities, Privileges, and Deliveries," that: "The rates named herein apply from and to the tracks, stations or other receiving and delivering points, on or to and from private sidings connected with lines parties to this tariff, where the particular traffic is usually received or delivered, and also include the use of receiving and delivering facilities at such stations or other receiving and delivering point, or private sidings, subject, nevertheless, to such charges (if any) for switching, terminal service. * *. * "

At the time of the cost study referred to herein, there were no track scales within the plant, and consequently no consideration was given to this factor. Scales were later installed and are now used in obtaining weight for invoice purposes of all cars loaded with cement in bulk. These cars constitute a considerable portion of those loaded.

Prior to October, 1934, the Commission, on its own motion, instituted an investigation known as Ex Parte 104, Practices of Carriers Affecting Operating Revenues or Expenses. Part II of that proceeding related to terminal services. The Commission made a thorough investigation of the subject relating to spotting of cars and interplant switching in the plants of large industries, and promulgated its report December 14, 1935, 209 I.C.C. 11, 46.

The Commission found in many industries allowances were being paid by carriers for services rendered by the shipper for interplant switching and spotting of cars, which were not in fact a part of the line haul, and that the carriers had in many instances assumed a burden not previously borne by them. It also found that section 15(13) of the Interstate Commerce Act (49 U.S.C.A. § 15(13), permitting payment by carriers to shippers for performing a portion of transportation service, was abused by unwarranted payments, which resulted in discrimination and disguised rebating.

The Commission laid down the following principle for determining improper allowances to shippers:

"When a carrier is prevented at its ordinary operating convenience from reaching points of loading or unloading within a plant, without interruption or interference by the desires of an industry or the disabilities of its plant, such as the manner in which the industrial operations are conducted, the arrangement or condition of its tracks, weighing service, or similar circumstances, as set forth more specifically in rules 8, 9 and 10 of the appendix, the service beyond the point of interruption or interference is in excess of that performed in simple switching or team-track delivery. Payment for, or assumption by the carrier of, the cost of

service performed beyond such points of interruption or interference is found to be unlawful in violation of section 6 of the act. [49 U.S.C.A. § 6].

"Generally the payment of allowances for service, or the performance of such service without charge, to points within a plant which respondents are prevented, by the desires of an industry or the disabilities of its plant, from reaching, without interruption or interference by the conditions mentioned in the preceding paragraph, provides the means by which the industry enjoys a preferential service not accorded to shippers generally. Such payment or performance dissipates respondents' funds and revenues, is not in conformity with efficient or economical management as contemplated by the Interstate Commerce Act, and not in the public interest."

Rules 8, 9 and 10 referred to in the Commission's report are as follows:

"Rule 8. The service between point of interchange and point of loading or unloading, as the case may be, shall be charged to the railroad, provided it is a progressive movement to point of placement or delivery, performed without plant interruption or interference. If plant interruption or interference is encountered the service after such interruption or interference shall be charged to the plant.

"Rule 9. The following is a partial list of what shall be considered as plant interruption or interference as referred to in Rule 8.

"(a) Convenience of the plant, such as service in excess of normal operation.

"(b) Plant operations that interrupt or interfere with movements of switch locomotives.

"(c) Holding of cars for advice from the plant as to disposition.

"(d) Weighing for account of plant.

"(e) Locomotive crane operation that interrupts or interferes with movements of switch locomotives.

"(f) Operation of plant locomotives while engaged in performing work solely for account of the plant that interrupt or interfere with movements of switch locomotives. This will include such services as switching car repair shop tracks of the plant, moving cars of material between locations within the plant, disposal of material for the plant, etc.

"(g) Maintenance or construction work, where it interferes with economical switching operations.

"(h) Crews waiting for instructions from the plant.

"Section 18 of Rule 10 reads in part as follows: On cars weighed for information on account of the plant the scale is the point of interruption or interference."

The general principles laid down by the Commission in Ex Parte 104 were approved by the Supreme Court in the case of United States v. American Sheet & Tin Plate Company, 57 S.Ct. 804, 81 L.Ed. ——, May 17, 1937, not yet reported. No orders applicable to specific shippers were made upon the main report of the Commission. Later, Division No. 6 promulgated supplemental report relating to particular plants. On the facts, as substantially set out in this opinion, the Commission promulgated an original and supplemental report relating to this plaintiff, and on August 12, 1935, issued to the Pennsylvania Railroad the following order:

"Upon further consideration of the record in this proceeding concerning the lawfulness and propriety of the allowance paid by The Pennsylvania Railroad Company to the Louisville Cement Company for performance by the latter of spotting service within its plant at Speeds, Ind., and the Commission having under date of May 14, 1935, made and filed a report in Propriety of Operating Practices—Terminal Services, 209 I.C.C. 11, containing its legal conclusions with respect to the general situation presented, and the division having on the date hereof made and filed a supplemental report containing its findings of fact and conclusions with respect to the allowance paid to the Louisville Cement Company, which reports are hereby referred to and made a part hereof, and the division having found in said supplemental report that by the payment of said allowance The Pennsylvania Railroad Company violates the Interstate Commerce Act as set forth in the above-mentioned reports;

"It is ordered, That the Pennsylvania Railroad Company be, and it is hereby notified and required to cease and desist on or before September 30, 1935, and thereafter to abstain from such unlawful practices."

Subsequent to consideration of shipper's petition for rehearing, on September 23, 1935, the Commission issued a further

order to the railroad, on the same subject matter, as follows:

"Upon further consideration of the record in this proceeding, and of petition dated September 5, 1935, filed by the Louisville Cement Company, requesting that the Commission vacate and set aside its thirty-eighth supplemental report and order in the above-entitled proceeding, entered as of August 12, 1935, and that the Commission reopen said case and grant a rehearing in so far as it relates to the plant of petitioner, and for other relief, and good cause appearing therefor:

"It is ordered, That the proceeding in Ex Parte No. 104, Part II, Terminal Services be, and it is hereby reopened for further hearing on such dates and at such places as the Commission may hereafter direct, in so far as said proceeding relates to the propriety and lawfulness of the allowance paid by the Pennsylvania Railroad Company to the Louisville Cement Company for the performance of spotting service at the latter's plant.

"It is further ordered, That pending the rehearing herein ordered, the order of the Commission entered as of August 12, 1935, attached to the thirty-eighth supplemental report in this proceeding shall remain in full force and effect."

Subsequently, further hearings were held by the Commission at Louisville, Ky., and on February 1, 1937, it handed down its report affirming and approving its orders and reports theretofore issued.

The plaintiff is seeking in this action to enjoin these orders.

The Commission, in its report, concluded that the line haul rates of the Pennsylvania covered deliveries to a reasonable and convenient point, which was the interchange tracks described in the record, and that plaintiff was entitled to no compensation for rendering any service beyond that point.

The only attack plaintiff makes on the Commission's order is that the facts found by it do not support its conclusions as to where the line haul ceases. It is admitted by the plaintiff, under its present method of operating its plant, the carrier, if alone rendering the service, would not be required to move cars beyond the interchange tracks. It insists, however, it was the duty of the Commission to determine the point where the line haul ends and the switching begins if, and when, interference is removed. It insists the Commission should have found that the uncontradicted evidence heard by it established the plaintiff would abandon the use of its own locomotives, change the method of loading mixed cement, and remove its weighing scales, which would remove all interference and require the carrier to handle the entire movement of cars and spot them at some point beyond the interchange tracks, but, if the industry rendered this service, it would be entitled to reasonable compensation.

Plaintiff's counsel claims the Commission fell into error, because the industry at the time of the hearing was doing its own switching and a part of the carrier's line haul in one continuous movement, and under such condition the plant interference was immaterial and that the Commission was only authorized under such circumstances to fix what was reasonable for the service rendered by the industry to the carrier, which was a legally approved practice with specific statutory authority under section 15(13) of the Interstate Commerce Act (49 U.S.C.A. § 15(13).

Section 15(1) of the Interstate Commerce Act (49 U.S.C.A. § 15(1), authorizes the Commission, after a hearing and conclusion that a carrier has violated any of its provisions, to issue a cease and desist order and it is unnecessary for the Commission to find, before issuing the order, that the carrier has made an unreasonable charge or granted an undue preference.

Section 13(2) of the act (49 U.S.C.A. § 13(2), confers authority on the Commission to institute an inquiry on its own motion as to any violation thereof, and to issue corrective orders. Section 12(1), 49 U.S.C.A. § 12(1), confers broad powers to inquire into the business management of carriers and to correct abuses.

Under the act as amended in 1920, section 422, 41 Stat. 488, adding section 15a(2), 49 U.S.C.A. 15a(2), it is provided: "In the exercise of its power to prescribe just and reasonable rates the commission shall initiate, modify, establish or adjust such rates so that carriers as a whole (or as a whole in each of such rate groups or territories as the commission may from time to time designate) will, under honest, efficient and economical management and reasonable expenditures for maintenance of way, structures and equipment, earn an aggregate annual net railway operating in-

come equal, as nearly as may be, to a fair return upon the aggregate value of the railway property of such carriers held for and used in the service of transportation: Provided, That the commission shall have reasonable latitude to modify or adjust any particular rate which it may find to be unjust or unreasonable, and to prescribe different rates for different portions of the country."

It will thus be noted the Commission has broad supervisory powers not only as to rate structure, but as to the business practices of carriers.

■ The term "transportation" includes delivery, but this does not contemplate either loading or unloading. It is frequently difficult to determine when delivery is completed or transportation begun. It is a question of fact, and the Interstate Commerce Commission is peculiarly fitted to determine at what point the carrier has begun or completed straight transportation. Almost every business using rail transportation has its private sidings and switches for loading and unloading its products. Formerly these were located so the carrier could, with its own equipment, place a car or cars on a siding and move on to another customer, without delay. As great industrial plants have been built, the simple siding has grown into an intricate railway system inside the plant, and spur tracks have radiated from the carriers' lines into the industry like fingers on a hand. The carrier making deliveries of carload shipments at such places must resort to a reverse movement, which slows up transportation and causes delay at the expense of other shippers. This requires idle equipment, resulting in a preference to the large industrial shipper.

■ The Commission had the authority to determine in the instant case where transportation under the line haul charge ended. It selected a convenient point for the plaintiff to receive inbound and deliver outbound freight. No doubt the industry could make its point of delivery within the plant so simple as to cause no delay or inconvenience to the Pennsylvania Railroad. It might be feasible to receive inbound freight and move its product without the use of interplant tracks, and, if such a state of facts were presented to the Commission, it should require the Pennsylvania Railroad Company to make deliveries and pick up shipments at some point other than the interchange tracks.

The plaintiff is not precluded by the decision of the Commission to again apply to it for an allowance under different facts.

■ Until the facts show the industry has arranged its shipping facilities to require the railroad under its line haul rate to deliver beyond the interchange tracks, the Commission would be dealing only with possibilities, which it is not required to do.

■ The Commission, on the facts before it, selected the point of delivery outside the interplant trackage and, as the plaintiff was rendering only negligible transportation service over the interchange tracks, it decided it was entitled to no allowance from the Pennsylvania.

The court, in the Los Angeles Switching Case (Interstate Commerce Comm. v. Atchison, T. & S. F. R. Co.), 234 U.S. 294, 314, 34 S.Ct. 814, 818, 58 L.Ed. 1319, said: "It is plain that the question whether or not there is at any point an additional service in connection with industrial spur tracks upon which to base an extra charge, or whether there is merely a substituted service, which is substantially a like service to that included in the line-haul rate, and not received, is a question of fact to be determined according to the actual conditions of operation. Such a question is manifestly one upon which it is the province of the Commission to pass."

Compare also: United States of America and Interstate Commerce Commission v. American Sheet & Tin Plate Company, 57 S.Ct. 804, 81 L.Ed. ——, decided May 17, 1937.

We are unable to say that the Commission's findings lack support in the evidence. We must, therefore, accept them and the orders of the Commission as lawful. The plaintiff's petition will be dismissed.

■ It is claimed by the defendants that this case is moot because the Pennsylvania Railroad Company has complied with the order of the Commission and ceased to pay the allowance. This contention is without merit. The order of the Commission is a continuing one and affects the rights of the plaintiff during its existence. It follows the court has jurisdiction to review. Southern Pacific Terminal Company v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42,

32 S.Ct. 22, 56 L.Ed. 83; Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667.