## ELGIN, J. & E. RY. CO. v. UNITED STATES et al.

## EAST CHICAGO DOCK TERMINAL CO. v. SAME.

### Nos. 557, 558.

District Court, N. D. Indiana, Hammond Division.

Jan. 23, 1937.

Knapp, Beye, Allen & Cushing, of Chicago, Ill., for plaintiff Elgin, Joliet & Eastern Ry. Co.

John S. Burchmore, of Walter, Burchmore & Belnap, of Chicago, Ill., for plaintiff, East Chicago Dock Terminal Co.

E. M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., and Elmer B. Collins, Sp. Asst. to the Atty. Gen., for defendants.

Before SPARKS, Circuit Judge, and BALTZELL, and SLICK, District Judges.

PER CURIAM.

These actions were brought under 38 Statutes 219 (28 U.S.C.A. § 41, subsecs. 8, 27, 28 and §§ 45, 46, 47), and under the general equity jurisdiction of this court.

Cause No. 557 is an action to enjoin the Interstate Commerce Commission and the United States of America from enforcing the terms of a cease and desist order, and for a decree adjudging the order void. Cause No. 558 demands the same relief, and in addition thereto seeks to restrain and enjoin the respondent carriers in that case from taking action under the same order of the Commission.

The challenged order was promulgated by the Commission on May 14, 1935, and cessation of the condemned acts was ordered on or before July 15, 1935. Interlocutory injunctions pendente lite were issued and the causes were consolidated for hearing.

The East Chicago Dock Terminal Company, referred to for convenience as the Dock Company, for several years has been engaged in the operation of docks and a terminal at East Chicago, Indiana, which are served by the respondent carriers. Carload freight is shipped and received over those docks and to and from that terminal by numerous owners, shippers, and receivers who are patrons or customers of the Dock Company, which likewise ships and receives carload freight to and from the docks. Those shipments move over the lines of respondent carriers in interstate commerce.

The Elgin, Joliet & Eastern Railway Company, referred to for convenience as the Elgin Railway, owns and operates a belt line of railroad around the city of Chicago, known as the outer belt. Pursuant to pertinent statutes, and rules of the Commission, it published tariffs with the Commission showing its rates for the transportation of goods between points therein named, in consideration of which it undertook to place cars at the respective points where the shippers and consignees desired them placed for loading or unloading. In certain cases it found it desirable not to complete, itself, the placing of the cars at the desired points for loading or unloading, and in such cases it provided, in a properly published tariff, that it would pay the shipper or receiver of the freight a certain amount for performing the completion of such spotting service. Such a payment is commonly called an "allowance." This latter relationship existed between the Dock Company and the respondent carriers at the time this controversy arose, and had so existed for a long time. It was a practice which had become prevalent with certain railroads in parts of the nation, and had been approved by the Commission as well as by our highest courts.

In 1931 the Commission, of its own motion and without complaint from any railroad, shipper, or consignee, entered upon a general investigation of the terminal service performed by railroad companies throughout the United States. As a result of that investigation, it made a general report in which it announced what

it termed "principles." Among those, it declared that in the delivery or receipt of goods at a plant of an industry by a carrier, any service beyond a point on the plant where interference in the service might occur, or beyond a reasonably convenient interchange track, or in excess of the service required in making a simple placement or the equivalent of team track spotting, was unlawful.

The Commission also made a special report with respect to the Elgin Railway and the Dock Company, which contained the following pertinent language: "We find that the interchange tracks described of record are reasonably convenient points for the delivery and receipt of carload freight; that the transportation service for which the respondent carriers are compensated in their line-haul rates or switching charges begins and ends at said interchange tracks; that the service performed by the terminal company beyond those points is a plant service; and that by the payment of an allowance to the terminal company for service performed beyond the interchange tracks on interstate shipments, respondent carriers provide the means by which the industry enjoys a preferential service not accorded to shippers generally and refund or remit a portion of the rates or charges collected or received as compensation for the transportation of property, in violation of section 6(7) of the act [49 U.S.C.A. § 6(7)]."

This report was accompanied by the following order:

"Upon further consideration of the record in this proceeding concerning the lawfulness and propriety of the allowance paid by the Indiana Harbor Belt Railroad Company, the Elgin, Joliet and Eastern Railway Company, The Pennsylvania Railroad Company and the Baltimore and Ohio Chicago Terminal Railroad Company, to the East Chicago Dock Terminal Company, for performance by the latter of spotting service within its plant at East Chicago, Ind., and the Commission having on the date hereof, made and filed a report containing its legal conclusions with respect to the general situation presented, and also having on the date hereof made and filed a supplemental report containing its findings of fact and conclusions with respect to the allowance paid to the East Chicago Dock Terminal Company, which reports are hereby referred to and made a part hereof, and the Commission having found in said supplemental report that by the payment of said allowance, the above-named respondent carriers violate the Interstate Commerce Act as set forth in the above-mentioned reports:

"It is ordered, That the Indiana Harbor Belt Railroad Company, the Elgin, Joliet and Eastern Railway Company, the Pennsylvania Railroad Company, and The Baltimore and Ohio Chicago Terminal Company be, and they are hereby notified and required to cease and desist on or before July 15, 1935, and thereafter to abstain from such unlawful practice."

The question here presented is whether the Commission had jurisdiction to enter this order.

Plaintiffs' argument is premised upon certain fundamental and primary rights of railroads which we concede: (1) They are permitted to make special contracts and to generally manage their interests upon the same principles as other trades and pursuits, subject, however, to the exceptions that their charges for transportation may not be unjust, unreasonable, discriminatory, or otherwise unlawful. (2) A railroad is entitled to initiate rates, and to adopt such policy of rate making as to it seems best, and it may undertake to transport goods over its railroad for any person upon agreed terms as expressed in published tariffs, subject to the limitations heretofore referred to.

Whether a published tariff rate is unjust, unreasonable, or discriminatory is a matter which the Interstate Commerce Commission by law has been empowered to determine under the existing facts and conditions. This determination is subject to review by the courts, except as to matters of fact which are supported by substantial evidence. From a perusal of the original Interstate Commerce Act of 1887 (24 Stat. 379) and its many amendments to date (49 U.S.C.A. § 1 et seq.), it is obvious that its principal objects were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circumstances and conditions; to prevent undue or unreasonable preferences to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line, and to abolish combinations for the pooling of freights. Interstate Commerce Commission v. Bal-

timore & O. R. Company, 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699.

The publication of tariffs by the carrier is authorized by section 6 of the act (49 U.S.C.A. § 6). Section 1(14), 49 U.S.C.A. § 1(14) provides that the Commission may, after hearing, establish rules, regulations, and practices with respect to car service by carriers by railroad subject to the act. The Commission, by section 12(1), 49 U.S.C.A. § 12(1), is authorized to inquire into the business management of all carriers subject to the act, and to enforce the provisions of the act. Section 13(2), 49 U.S.C.A. § 13(2), empowers the Commission to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which a complaint is authorized to be made, or concerning which any question may arise under any provisions of the act, or relating to the enforcement of any of its provisions, and to make and enforce any order or orders in the case, or relating to the matter or thing concerning which the inquiry is had. Section 15(1), 49 U.S.C.A. § 15(1) provides that, before the Commission may make a cease and desist order, it must first reach the conclusion that a rate or practice is unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of the act. Section 15(13), 49 U.S.C.A. § 15(13), provides that, if the owner of property transported renders any service "connected with such transportation," the charge or allowance therefor shall be no more than is just and reasonable and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable maximum charge for such service, and fix the same by an appropriate order. Section 15(14), 49 U.S.C.A. § 15 (14), provides that the enumerated powers shall not exclude any power which the Commission would otherwise have in the making of an order under the provisions of the act.

It is first contended by plaintiffs that the Commission's authority to make the order, which they deny, must be found, if at all, in section 15(1) of the act, 49 U.S.C.A. § 15(1), which, so far as pertinent to the questions here involved, is set forth: "Whenever, after full hearing, * * * the commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers * * * or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this chapter, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this chapter, the commission is authorized and empowered to determine and prescribe what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, * * * and what individual or joint classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation or transmission other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed."

Under this section, it is obvious that, before the Commission can act, it must first reach the conclusion that a rate or practice of the carrier is or will be unjust or unreasonable, unjustly discriminatory, unduly preferential or prejudicial, or otherwise in violation of any of the provisions of the act.

Plaintiffs' argument assumes with certainty that the so-called spotting services involved in these controversies constituted transportation within the meaning of the act; that the railroads were lawfully bound to perform those services under their contractual obligations of the published tariffs; and that the tariff rates must be considered as just and reasonable compensation for such services, and undiscriminatory until the Commission find to the contrary.

With this contention we are unable to agree. It is quite true that section 1(3) of the act, 49 U.S.C.A. § 1(3), provides that "The term 'transportation' as used in this chapter shall include * * * all services in connection with the receipt, de-

livery * * * and handling of property transported," but we cannot believe that it was the intention of Congress that a railroad, having received a shipment or an order for empty cars and having transported either to the premises of the consignee or shipper ready for delivery, should, without fault on its part, be compelled to stand by for many hours and perhaps days in order to place the cars for loading or unloading at the particular place and at the particular time most advantageous to the needs of the consignee or shipper. It is true that the courts have held that the place of delivery means the point of loading or unloading, but we are convinced that this construction must be interpreted to mean that there shall always be accorded to the carrier a reasonably immediate access to the point of loading or unloading. Otherwise, the burden placed upon the carrier in many instances would be most inequitable. The growth of industries and the extension of plant areas with their networks of private railroad tracks where many cars are continuously needed for loading and unloading have made it necessary in many instances to have a switching engine continuously present. In comparatively recent years, therefore, the question has frequently confronted the courts and the Commission as to whether the switching done by an industry within its own plant, between the interchange or storage tracks and its loading or unloading platforms, is work that the railroad is required to do as a part of transportation. In American Sheet & Tin Plate Co. et al. v. United States (D.C.) 15 F.Supp. 711, 713, decided May 23, 1936, by a three-judge court in the Western District of Pennsylvania, it was stated: "There appears to be no exact formula that can be applied in answering this question. The most that we can get from the decided cases is that the limits of place within which delivery is due will vary with varying conditions, and that such delivery is required, as is customary and reasonable."

In that case the court held that the spotting terminal switching service there involved was a transportation service which the railroads were by law required to perform. It further said however, that, while spotting service is transportation within the statutory definition and was a common carrier service up to certain limits, yet it did not "include special or particular 'spotting service' such as described in New York Central & Hudson River R. R. Co. v. General Electric Company, 219 N.Y. 227, 114 N.E. 115, 1 A.L.R. 1417, over an intricate system of trackage when the railroad is not permitted to enter to extend any 'spotting service' at all." The opinion then sets forth the following "typical circumstances" which would relieve the carrier from the duty of spotting: "(a) Where an industry refuses to permit the railroad to enter upon the private industrial tracks; (b) where the physical condition and layout of the private industrial tracks will not accommodate the carrier's locomotive power without hazard or *excessive delay;* (c) where the industry occupies large areas with many scattered plants, connected by an intricate system of industrial tracks and *used chiefly as industrial facilities.*" (Our italics.) This language clearly implies that there may be other circumstances closely analogous to the types mentioned which also might thus limit the carriers' duty. Obviously, the question propounded is one of fact which constitutes the basis for that court's rational conclusion that no exact formula can be applied in answering it.

The provisions of the act, both express and implied, convince us that it is the duty of the Commission primarily to answer this question and its answer cannot be controverted by the courts, if it is based on substantial evidence. In the case just referred to, the court said, " * * * we find no circumstances which would relieve the carriers involved from the duty of 'spotting' the cars as a part of the transportation imposed upon them by law." We think that statement is tantamount to saying that the Commission's factual conclusion to the contrary was not supported by substantial evidence. This being true, and not within our province to dispute, it logically follows that the court was correct in concluding as a matter of law that "the commission was without power to prohibit entirely allowances for doing 'spotting service.' "

Many cases have been cited by the parties herein concerned, but they are not directly decisive of the question before us because of the varying respective conditions. We agree with Judge Schoonmaker and his associates in the case we have discussed in the statement that the applicable decided cases hold that the limits of place within which delivery is due will vary with varying conditions, and that such de-

livery is required as is customary and reasonable.

While no exact formula can be applied, yet certain principles can be followed which will be both helpful and equitable as applied to all cases. We think it was within the province of the Commission under the act to promulgate and enforce the principles which they announced, as hereinbefore referred to. They seem to us to be fair, and are sufficiently flexible in their application to cover all cases, and are calculated to approximate the rights and duties of the parties involved as nearly as it is humanly possible.

■ It is urged by plaintiffs, however, that the deliveries and the allowances therefor, which are the subject of the order, are both customary and reasonable. With respect to the custom, the record discloses that some carriers follow it and some do not; in some territories it is followed and in some it is not; with respect to some industries it is practiced by some carriers, and with respect to other industries it is not; some industries do their own plant switching, others do not; of those who do, some receive allowances therefor from the carriers, many more do not. Obviously, there was substantial evidence to support the conclusion that there was no general custom. Moreover, if any or all of the carriers, either voluntarily or by coercion, had submitted to the practice of rendering services under the guise of transportation services, which in reasonableness and in good faith could not be considered as a part of transportation, a continuation of that practice would never amount to a custom upon which the industries could claim a vested right of its continuance, for in that event the custom would be an unreasonable one, and any allowance therefor would likewise be unreasonable, nor would the custom or the lack of reasonableness and validity be aided in any way by the proposals in the tariff publications.

It is true that the Commission made no finding or conclusion that the allowances for what it termed "plant services" constituted unreasonable compensation for such services. It was unnecessary to do so because it found that all such services were unlawful. Hence they were inherently unreasonable and unjust by reason of their unlawfulness. For the same reason, it was unnecessary for the Commission to specifically find that the rates were discriminatory.

■ The matter of findings of the Commission is covered by section 14(1) of the act, 49 U.S.C.A. § 14(1): "Whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall state the conclusions of the commission, together with its decision, order, or requirement in the premises; and. in case damages are awarded such report shall include the findings of fact on which the award is made." In these cases no award of damages was made. The supplemental report finds all important basic facts, such as physical location and arrangement of plant, plant tracks, carriers interchange and other tracks, actual conditions of operations, and all pertinent circumstances relative to the physical movement of cars. From these reported facts the Commission found that the spotting of cars within the plant was a plant service and was not transportation within the meaning of the act. We think this was a compliance with the statute.

We are further convinced that the order is supported by substantial evidence, and that the evidence constitutes a sufficient basis for the Commission's conclusions. Los Angeles Switching Case, 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319; Lehigh Valley R. R. Co. v. United States, 243 U.S. 444, 37 S.Ct. 434, 61 L.Ed. 839; New York Central & Hudson River R. R. Co. v. General Electric Co., supra.

It is to be noted that neither complaint alleges that the basic facts found are without support of evidence, or that they are not proved, or are inaccurately stated by the Commission. The alleged insufficiency of evidence is limited to the claim that there is no evidence to support the conclusions. We think this allegation has not been established. The argument in support of it is quite largely based on the premise that the obligation to spot cars is a legal one. As a general rule we accept that premise; however, we think it must always be subject to the limitations placed upon it by the reasonable principles promulgated by the Commission in the interpretation of the statute which defines "transportation." We think those principles do no injustice to the statute, and the order should be upheld.

The Commission's order is within its statutory authority; the findings are suf-

ficient to support its order; the findings are supported by substantial evidence and the order should be sustained.