JARKA CORPORATION OF BALTIMORE
v. PENNSYLVANIA R. CO.

Civil Action No. 1296.

District Court, D. Maryland.

Dec. 20, 1941.

R. E. Lee Marshall and George C. Doub, both of Baltimore, Md., for plaintiff.

Windsor F. Cousins, of Philadelphia, Pa., and Edward E. Hargest, Jr., O. Bowie Duckett, Jr., and Hargest, LeViness, Duckett & McGlannan, all of Baltimore, Md., for defendant.

CHESNUT, District Judge.

The plaintiff is a general stevedoring corporation doing business at the Ports of Baltimore, Philadelphia, and other places on the Atlantic seaboard. The defendant is The Pennsylvania Railroad Company which has pier terminals in Baltimore, Philadelphia and other Atlantic ports. In this case the stevedoring corporation is suing the Railroad for services in "barring" open top rail cars placed by the Railroad alongside the hatches of freight steamships docked at the piers of the Railroad in the Baltimore Harbor. The "barring" of railroad cars means the shifting of the position of the cars for short distances so that they will be made more accessible to the ship's tackle for purposes of loading or unloading. The defendant denies that the so-called barring of cars was performed for its account and denies that it agreed to pay for the service. The period covered by the plaintiff's claim is from July 1, 1938 to December 13, 1940. The amount of the claim is for $5,718. at the rate of $1. per car. The case has been removed to this federal court on the ground of diversity of citizenship, the plaintiff being a corporation of the State of Maryland, and the defendant being incorporated under the laws of the State of Pennsylvania. The instant case is one of a series of more than thirty instituted by different stevedoring corporations doing business in Baltimore, against some one of the four railroad com-

panies having pier terminals in Baltimore. The present case is the first one of the series to be tried.

From the testimony in the case I make the following findings of material facts.

### Findings of Fact

1. This case relates to rail carriage from inland points to Baltimore of heavy freight carried in open top cars, such as ores and steel, and to similar cargoes brought to Baltimore by ship, destined ultimately to inland points, and loaded for the export shipments from the cars to the ship, and for import shipments from the ship to the cars. The Railroad by its own motive power places the cars on its own tracks on the pier, either singly or in a series, and opposite the particular hold of the ship, which is docked at the pier, at the time designated by the ship, the written order of the ship also designating whether a single car or a series is to be placed by the Railroad. This applies whether shipment is inbound or outbound. To load or unload the cars it is necessary that they must be within the reach of the "ship's tackle"; and in the process of loading or unloading it sometimes becomes necessary or convenient to shift the cars a short distance on the tracks so that the freight can be properly loaded or unloaded into or from the cars by the ship's tackle. If a single car is placed opposite a designated hold of the ship, it ordinarily is not necessary to shift the position of the car on the rails during the process of loading or unloading; but if two or three cars are placed in series at one hold of the ship, it is generally necessary to first load or unload one car and then shift it out of the way on the tracks and shift another car immediately opposite the hold and within the reach of the ship's tackle. The plaintiff makes no claim for compensation for services for the particular work of shifting a single car when placed alone opposite a particular hold; but it does claim that whenever a series of cars is placed opposite a hold, each one of the series must be barred or shifted during the process of loading or unloading, and that $1. per car placed irrespective of the amount of labor necessarily required in shifting a particular car, is a fair and reasonable price for the services performed on the average for all cars placed. The so-called barring of the cars is done by stevedores using one of three methods: (1) Shifting the car by means of a tool somewhat like an ordinary crowbar placed between the under surface of the wheels and the rails; (2) or by the use of a small power tractor to push or pull the cars; or (3) by means of a cable attached to the cars and moved by the ship's winch.

2. The plaintiff's case is based principally on the custom said to have been continuously prevailing for many years prior to July 1, 1938, in the Port of Baltimore alone and not elsewhere. Prior to 1914 any such necessary shifting of the cars was done by laborers furnished and paid by the Railroad. In that year the stevedoring companies, employed by the ships and not by the Railroad, complained that they were subjected to undue delays in loading and unloading the ships by reason of the inaccessibility from time to time or the inefficiency of the Railroad workmen. Apparently by a uniform agreement of all four Railroads having terminal piers in Baltimore with the several stevedoring companies here, the latter were permitted to perform the work themselves and were compensated by the Railroads on a time basis of at first 27 cents per hour. Subsequently the $1. per car flat rate was substituted. This arrangement continued until shortly before July 1, 1938. The four railroads are the Pennsylvania, the Baltimore and Ohio, the Western Maryland and the Canton Railroad.

3. For some years past there has been in Baltimore an association called "The Steamship Trade Association of Baltimore" the membership of which includes steamship companies, agents of steamship companies, and stevedoring companies. In loading and unloading freight from rail to vessel in open top cars (which is alone involved in this case), the stevedores are employed and paid by the ship, but at the railroad terminal piers there is also the necessary loading and unloading of so-called package freight into railroad box cars. For this latter purpose, the stevedoring corporations are employed and paid by the Railroads. In May 1938 a committee of the Steamship Trade Association on behalf of the stevedoring companies requested the Railroads for an increase in rate for this latter service. The matter was considered by a committee composed of representatives of each of the four railroads. On June 10, 1938 the Railroad Committee by letter to the chairman of the Steamship Trade Committee, declined

to agree to an increase in the rate paid for that service, and in the same letter also stated as follows:

"It was also unanimously decided by the representatives of the four railroads that the allowance being made stevedores of $1. per car for barring cars will be discontinued effective July 1, 1938."

This last paragraph of the letter related exclusively to the services for which claim is made by the plaintiff in this case and was so understood by the plaintiff's representatives. Thereafter an extended correspondence ensued between the two committees covering the period of June 16, 1938 to February 13, 1940. The substance of the correspondence was that the stevedoring companies stated they would continue the "barring" of the cars and requested further consideration as to the continuance of the "allowance"; and it appears that the subject matter was further discussed in subsequent meetings of the two committees and in the correspondence. On March 4, 1939 Mr. VanHorn, chairman of the Railroad Committee, by letter advised Mr. Fleagle, President of the Steamship Trade Association, that the Railroad's decision in the letter of June 10, 1938 was *confirmed*. The letter also stated that the Railroads had been advised by their counsel that their duty in making "delivery of shipments alongside of vessel" was completed when the cars were placed on the tracks alongside the vessel. The stevedoring companies asked for another joint meeting of the committees. This latter meeting was held March 29, 1939. There was conflict in the oral testimony of the witnesses for the plaintiff and defendant with respect to what was said at this meeting. Mr. Herman, the representative of the B. and O. at the meeting on the same day, made a written memorandum of what had transpired at the meeting. In view of the conflict in the oral testimony of the witnesses and after considering the whole thereof, I adopt the testimony of Mr. Herman and his memorandum as the more convincing and correct account of what transpired. (See Def.'s Ex.No. 4.) For the Railroads, their position was restated that they considered their duty ended with the original placing of the cars at the ship's side, and that therefore the allowance to the stevedores was contrary to the general decisions rendered by the Interstate Commerce Commission in regard to similar matters. The memorandum then continued:

"After lengthy discussion of the matter, without any progress in either direction, it was the unanimous agreement of the members of the Railroad Committee that the question would be re-submitted to our legal departments for decision on their part concerning the propriety of submitting a brief to the Commission fully setting forth both sides of the question at issue, and asking the Commission for a ruling thereon, to which the Steamship Trade Association Committee agreed."

"The matter will be presented through Mr. C. R. Webber, General Attorney, Baltimore & Ohio, for handling with legal representatives of the other railroads involved to determine the propriety, first, of such action, and in event it is decided to submit the question to the Commission, that the Steamship Trade Association will have an opportunity to review the brief before it is submitted to the Commission and make such additions thereto as they feel are proper."

Thereafter each of the Committees submitted to the other their respective statements proposed to be submitted to the Commission, but the parties were unable to agree upon the wording of the statement. In view of this inability to agree, Mr. Fleagle, President of the Steamship Trade Association, wrote to Mr. VanHorn on Feb. 1, 1940, suggesting that the entire matter be submitted to the Traffic Department of the Baltimore Association of Commerce. This suggestion was declined by Mr. VanHorn on Feb. 10, 1940, who, in turn, suggested that if a single joint statement could not be agreed upon the parties might respectively submit each their own statement of facts to the Commission "for informal decision of the Commission"; but this suggestion was in turn declined by Mr. Fleagle on Feb. 13, 1940. He said that his Committee was unfamiliar with the procedure before the Commission and had submitted their statements to the Traffic and Transportation Department of the Baltimore Association of Commerce with the request that it review their file to determine the facts and prepare a statement to be submitted to the Commission "for an informal hearing and decision." It appears that the local trade association was reluctant to act in the matter as requested, and further negotiations between the parties apparently then ceased. Some time thereafter this suit was instituted.

4. A typical railroad bill of lading for the export shipments involved in this case (See def's. Ex.No.2) shows that the freight was received by the Railroad Company from the National Tube Co. (the shipper) at McKeesport, Penna., consigned to "U.S.Steel Export Co., Care Isthmian SS Line—destination Canton, Baltimore, Md., Route PRR to pier 1, Canton for export (steamer sailing Nov. 22)."

5. The tariff of the Pennsylvania Railroad Company filed with the Interstate Commerce Commission, publishing rates on export, coastwise, and intercoastal traffic through Baltimore contains the following provisions: "Rates named herein to Baltimore, Md., will apply on shipments delivered to vessels direct from Railroad owned pier or piers leased to and operated by the Railroad Company at Baltimore." Rates on import, coastwise and intercoastal traffic, received from vessels were published in tariffs containing the following provision: "Rates named herein will apply on property delivered to the rail carrier direct from ship's side or dock or vessel bringing such property to origin station."

6. The practice between the railroads and the steamships with respect to the loading or unloading of open top cars is that when the cars reach Baltimore and are ready to be delivered on the railroad tracks alongside the ship, the ship's representative notifies the Railroad's representative at the pier to place cars designated by number at particular hours of the day opposite specified holds of the ship. For illustration, see defendant's exhibit No. 1, being an order from the Superintendent of the Isthmian Steamship Company to Mr. Jones of the Railroad as follows:

"Please place on pier 1 PRR south side lower end (outside track) for 8 A. M. Monday, November 13, 1940, for SS Steel Trader

"PRR 348237; PRR 336632; PRR 66494- under boom No. 2 Hatch south track;" and also designating other car numbers to be placed at the same time under other numbered booms of the ship. The respective orders designate the number of cars (whether 1, 2 or 3) to be placed under particular numbered booms of the ship. When the cars have been wholly or partly unloaded and the ship desires relocation of the cars its representative subsequently gives orders to the Railroad representative "to remove empties and put back parts". This means that cars entirely unloaded should be removed by the Railroad and cars only partly unloaded should, after the necessary shifting operation, be put back in the same locations with respect to the booms. This shifting of the cars is done by the Railroads with its own shifting engines, and is entirely separate and apart from the barring or shifting of the cars involved in the plaintiff's claim for services. The uncontradicted testimony of the Railroad's pier superintendent is that the Railroad always shifts cars with its own power as and when requested by the ship. The barring operation performed by the stevedores is therefore an *intermediate* operation between the initial placing and the later shifting of the cars by the Railroad's own motive power.

7. The plaintiff stevedoring corporation makes a written contract with the vessel for the necessary stevedoring services for agreed unit rates of cargo handled. See Plaintiff's Ex. No. 9, where the freight consisted of scrap in bundles at 81 cents per gross ton, and scrap steel at $1.10 per gross ton. The actual work is, of course, done by stevedores employed and paid by the plaintiff. The contract between the stevedoring company and the ship is subject to certain printed conditions, No. 7 of which reads:

"Detentions, Waiting or Lay Time. When men are employed and detentions in excess of 15 minutes occur, or when men are employed and unable to work through causes beyond the Contractor's control, or when men are to be paid for a minimum working period in accordance with the wage agreement, the cost for such time will be charged for at cost plus insurance."

8. I find, as an inference from the whole testimony, that it is to the interest and benefit of the stevedoring companies in a financial sense to do the necessary intermediate barring or shifting of the cars to prevent delays in actual working time by the stevedores. And it is for this dominant reason that the stevedoring corporations have continued to perform whatever intermediate barring or shifting of the cars has been performed since the effective date of the discontinuance of payment therefor by the Railroads on July 1, 1938. The stevedoring companies also

hoped to prevail on the Railroads to resume payment for the intermediate barring of cars or ultimately obtain a binding decision that the Railroads must make the payment to them.

9. The number of cars alleged to have been barred or shifted as contained in the plaintiff's claim is over 5,000. There is no affirmative and direct evidence as to how many of these cars were actually barred or shifted by the plaintiff or what amount of barring or shifting was done with respect to them severally. In this respect the plaintiff's testimony in substance is that some such intermediate shifting must necessarily be performed on practically all cars placed alongside the ship and that $1. per car is an average reasonable charge, without proof as to actual work on the several cars. It further appears from the testimony that bills on this basis were for many years prior to July 1, 1938, rendered to and paid by the Railroads. The Railroads' agents do not check, and apparently have no system of checking, what is done by the stevedores with regard to intermediate barring of cars.

10. The custom prevailing in Baltimore until July 1, 1938, with respect to this barring charge is peculiar to the Port of Baltimore and is not known or practiced at other Atlantic ports. The Railroads have made no similar payments to stevedores for barring cars at other Atlantic ports. The plaintiff performs similar barring services under similar conditions at railroad terminals in Philadelphia; but has never received any payment therefor from the Pennsylvania or other railroads.

11. The plaintiff sets up and relies on an *express conditional* promise by the Railroads to pay for the services "if found legal". By the preponderance of the evidence, I find that the plaintiff has failed to prove the promise alleged.

## Opinion

The nature of the plaintiff's claim is a common law suit in assumpsit for services performed for the defendant. It is therefore necessary for the plaintiff, to prevail, to show an agreement to pay for these services either express or implied from the circumstances. Ordinarily the plaintiff can prima facie show an implied agreement to pay when the services have been performed for and the benefit

thereof accepted by the defendant. But in this case there is no room for finding an implied promise to pay when it appears that the defendant expressly refused to pay before the services were performed. Cleaves v. Sharp & Dohme, 166 Md. 546, 554, 171 A. 374. In view of this the plaintiff's position as to the defendant's liability proceeds upon the theory that despite notice by the defendant of its refusal to continue to pay after July 1, 1938, nevertheless thereafter the negotiations were continued between the parties and resulted in an express *conditional* promise to pay for the services "if it was found legal" for the defendant to pay for them.

The burden of proof, or at least of persuasion, is clearly upon the plaintiff to show the making of this conditional promise by a preponderance of the evidence. I do not find that the plaintiff has sustained this burden in this case. The testimony to support it is principally that of Mr. Fleagle, president of the Steamship Trade Association, and an executive of one of the interested stevedoring companies (other than the plaintiff in this particular case) based on his recollection of verbal statements made by some of the Railroad representatives in one or more of the Committee meetings, but contradicted in substance by witnesses for the defendant who were also members of the Railroad Committee in attendance at the meetings. The correspondence between the two committees, which represented their official communications and summarized their actions, contains no indication that the promise as alleged was made by the Committee as a whole for the several Railroad Companies, nor does the testimony as a whole show that the Railroad Committee was sufficiently empowered to bind the several Railroad Companies, including the defendant, except upon their unanimous agreements. It is true that the negotiations between the Committees were not at any time peremptorily broken off, although they were discontinued in February 1940, as stated in the above findings of fact. By unanimous agreement the Railroads refused to continue the payments after July 1, and subsequently confirmed this position, after some of the negotiations, on March 4, 1939. The nearest approach to a modification of the Railroad's position is found in the memorandum of the meeting of March 29, 1939 made by Mr. Herman of

the B and O, which was to the effect that the matter should be referred, if found proper, to the Interstate Commerce Commission. It is perhaps possible to infer from this that there was at least a tentative agreement at the time by all the Railroads that, if the *Commission* determined the continuance of the payments to the stevedores for their barring work was proper, then the Railroads would thereafter continue the payments of the past or some modified basis. But even if it could be inferred that this was the agreement, it certainly did not clearly go to the extent of agreeing to make the payment retroactive for the past services involved in this suit. Furthermore, it is found from the facts recited that the stevedoring companies abandoned the proposal to submit the matter to the Commission, or at least discontinued their cooperation with the Railroads along that line. That this was the course of development of the matter is not disputed by counsel for the plaintiff who, however, contend for the legal proposition that the alleged verbal promise to pay for the services "if found legal", was not limited to the determination of legality by the Interstate Commerce Commission but should be broadly construed, in view of the whole nature of the case and the course of negotiations between the parties, to mean that the promise to pay was conditioned only upon a determination of legality by a court of competent jurisdiction, that is in the present case, by this court. But the weight of the evidence does not support this contention. I do not question the sincerity of Mr. Fleagle's testimony as his best recollection of the verbal statements at the meeting, but I do not think I can properly accept his purely oral recollection, not supported by any contemporaneous memorandum, as sustaining the burden of proof incumbent upon the plaintiff, in view of the testimony to the contrary by several other witnesses, and especially in view of the more convincing evidence furnished by the contemporaneous memorandum made by Mr. Herman.

The necessary *conclusion of law* is that the plaintiff is not entitled to recover in this case. It is therefore perhaps unnecessary to consider other more generally important questions of law which have been very ably discussed by counsel in the case. But in view of the fact that the instant case is in the nature of a test case

affecting more or less directly the numerous other cases of the same nature now pending, and in view of the earnest insistence of counsel for the plaintiff that the ground above stated for denying the plaintiff's recovery is only a narrow one dealing with the subject matter from a purely "legalistic" standpoint, I will undertake to express my opinion on some of the other points of law that have been discussed.

The basic proposition urged by the plaintiff is that it was the legal duty of the Railroad, in making "delivery" to the ship of export freight, and in the placing of cars to receive import cargo, to place *each* of the railroad cars within the reach of the ship's tackle. They say that this flows necessarily and directly from the common law duty of the rail carrier to make proper delivery to the ship, in view of the long prevailing particular custom of the port. They further contend that this duty of delivery is not performed when the railroad, pursuant to the ship's order, places more than one car in a series approximately opposite a particular numbered boom of the ship, because, as they contend, it is the affirmative duty of the railroad to thereafter shift each of the cars to the extent necessary to permit all the contents of each car to be conveniently and effectively placed within reach of the ship's tackle. Thus they say that delivery is not complete until there has been the necessary *intermediate* shifting of the cars by the barring process by the stevedores or by others employed by the Railroad. It is not contended that the Railroad must intermediately shift a *single car* placed opposite a single boom of the ship; but it is contended that when two or more cars are originally placed at one time there must be further service in shifting by the Railroad Company to bring each of the cars within the reach of the ship's tackle. Counsel for the plaintiff further contend that in export or import shipments of this kind involving delivery between the rail and water carriers, the question of what constitutes a good delivery by the rail carrier to the vessel or from the vessel to the rail carrier, is not within the jurisdiction of the Interstate Commerce Commission but must be determined by the common law duties of the rail carrier.

To the contrary, counsel for the Railroad contend that the original place-

ment by the Railroad pursuant to the ship's order of two or three cars in series alongside of the ship at the place and at the time designated by order of the ship, constitutes delivery by the carrier, which, it is said, has no further duty to perform, at least unless and until there is a further request directly from the ship to the Railroad for shifting of the cars, and that when such requests are received they are complied with by the Railroad by the use of its own ordinary motive power. It is further contended for the Railroad that it has fully performed its duty to make delivery in accordance with the published tariffs, which provide only that delivery shall be made direct to the ship on railroad tracks alongside the ship; and that the intermediate barring of the cars by stevedores is a voluntary performance on their part for their own convenience in order to avoid otherwise unavoidable delays; and that the continuance of making the allowance to the stevedores which prevailed until July 1, 1938, would be contrary to the rulings of the Interstate Commerce Commission and recent decisions of the Supreme Court of the United States. It is also contended for the Railroad that the determination of the question as to whether the allowance to stevedores for intermediate barring is permissible under the tariff rate is necessarily an *administrative question* which can properly be determined primarily only by the Interstate Commerce Commission, and is not within the jurisdiction of this court until after the Commission has acted thereon. Armour & Co. v. Alton R. Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771; United States v. American Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186; General Am. Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; Loomis v. Lehigh Valley R. R., 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517; Elgin, J. & E. Ry. Co. v. United States, D.C., 18 F.Supp. 19; Louisville Cement Co. v. United States, D.C., 19 F.Supp. 910; Goodbody v. Pennsylvania R. R. Co., 6 Cir., 29 F.2d 67. But I am not satisfied that these cases properly preclude the determination by the court in this case of what constituted a sufficient delivery by the defendant. The cases cited were all contests between a shipper and a railroad in which the question of delivery was directly and necessarily bound up with the determination of what constituted a reasonable rate or possibly a discriminatory rate. It is true that the General American Tank Car Co. v. El Dorado Terminal Co., supra, was in form a suit by a shipper against a third person other than a railroad, but in substance the case involved the question of the proper carrier rate to the shipper. The present case, however, is not a contest between the shipper (or the ship) and the railroad but is an ordinary suit in assumpsit against the railroad by alleged employes of the railroad for services alleged to have been performed for its account. The question of rate making is only indirectly involved, if at all, because it is an element of the plaintiff's case to show that delivery by the Railroad was not complete without the necessary intermediate barring by the stevedoring companies. Nor does the question of proper delivery in this particular case involve such complex questions of transportation and rate making as were necessarily involved in the cited cases. (See 28 Cal. Law Review 143-148.) The question as to whether a common carrier has perfected delivery is in many cases an ordinary judicial question. I therefore consider that this court has jurisdiction to decide the question as to the carrier's duty of delivery under the circumstances here involved; and in my opinion the carrier has fully performed its duty to the shipper, and to the ship as consignee, by the services in originally placing and subsequently shifting the cars *as requested by the ship*.

Sufficient data for the determination of this question is presented by the carrier's published tariff, the terms of the typical bill of lading, the physical conditions prevailing on the piers, and the testimony as to the customs or usages heretofore or now prevailing. The tariff provides that the delivery shall be made *directly* to the ship; but it is not contended that the expense of unloading must be sustained by the carrier. The rail carrier's duty is fully performed when it places the car on its tracks alongside the ship and within the reach of the ship's tackle. Clearly the carrier is not obliged to place more than one car at a time, and if this is done, it can admittedly be placed within the reach of the ship's tackle. If the ship on its own initiative orders the placing of more than one car at a time opposite a particular boom, that is obviously a matter for the ship's determination as to its own convenience. Doubtless the decision is based on practical considerations for ex-

pediting the whole process of loading or unloading of cargo; and if, as a result of placing cars in series, a ship's tackle cannot reach all of the cars so placed, the ship can and does ask the Railroad to make the necessary shifting of the cars to bring their contents within the reach of the ship's tackle, and this, the testimony shows, the Railroad does. Of course where several series of railroad cars are at one time placed on one or even two parallel tracks alongside the ship, it is obvious that the Railroad cannot, by its ordinary motive power, under usual operating conditions, intermediately shift one or more of the cars in the different series, all on the same track. The ordinary motive power of a steam railroad is by a locomotive attached to one end of a train of cars. It would be quite unreasonable, in the ordinary operations of transportation, to require a railroad to attach a separate locomotive to each of two freight cars. The requirements of the ship or of the stevedores for economizing time in loading or unloading must be subject to the reasonable convenience of railroad transportation. If it is to the financial advantage of the ship or the stevedores to make intermediate shifting of the cars to avoid delays that would result from waiting for shifting by the Railroad's own motive power, the cost of this super service should be borne by the ship or the stevedores to whose benefit it inures, and not imposed as an extra burden on the Railroad to be absorbed in an otherwise reasonable rate. Elgin, J. & E. Ry. Co. v. United States, D.C., 18 F. Supp. 19, 23; Practices of Carriers Affecting Operating Revenues or Expenses, 209 I.C.C. 11.

▆▆▆ In support of its contention plaintiff relies on the custom or practice prior to July 1938. It takes the position that this practice once established could not be discontinued by the Railroad Company because it necessarily defined the duty of delivery. Here plaintiff's counsel is apparently using the word "custom" in the sense of something which of its own force has crystallized into a rigid rule of law; and as distinct from a "usage", the function of which is merely to supply an implied term of a contract. 2d Williston on Contracts, § 649. In so applying the word "custom" the plaintiff fails to distinguish between the general duty of the carrier to place the cars within reach of the ship's tackle (which may be said to be compounded of the requirements of the

tariff and the bill of lading, and the physical conditions on the pier as they have customarily existed and been employed in the past), and the particular practice with respect to the method or manner in which the cars are placed opposite the particular boom of the ship, which cannot have been other than a mere usage or practice, and did not rise to the dignity of a rigid rule of law. While it is properly spelled out from the tariff and bill of lading and the long existing physical conditions at the piers that it was the duty of the rail carrier in making delivery to bring the car within the reach of the ship's tackle, it does not at all follow that in performing this duty the carrier was obliged to do so in any particular manner or in such a way as to serve the special convenience of the ship or its stevedoring employes in economy of time, beyond the reasonable transportation facilities of the rail carrier. If in practice before July 1938 the rail carrier, after placing the cars in series instead of singly, shifted them intermediately by manual labor furnished by its employes, or by the stevedoring companies paid by the rail carrier, instead of by a shifting engine, this practice was no more than a usage which could be changed by the rail carrier. In this case the carrier did change the usage or practice effective as of July 1, 1938, after due notice to the stevedoring companies; which was also effective notice under the circumstances to the ships as consignee of the freight. Here neither the shipper nor the ship is making any complaint against the rail carrier with respect to sufficiency of delivery. If we assume that the particular usage, custom or practice as to intermediate shifting could not have been properly abrogated by the rail carrier without notice to the shipper or the ship, it certainly does not follow that the rail carrier was under any obligation to continue the particular practice so far as the stevedoring companies were concerned after due notice to them. At best their relations to the rail carrier prior to July 1, 1938, were merely that of employes whom the rail carrier had the right to dismiss as such employes at any time at will. Even if it could be determined that the custom or usage continued for the benefit of the shipper or the ship, it could not be said to continue for the benefit of the stevedoring companies as employes of the Railroad after notice by the latter that it would no longer be bound by the custom or usage. 2 Wil-

liston on Contracts, § 656; Moore v. United States, 196 U.S. 157, 166, 25 S.Ct. 202, 49 L.Ed. 428; Agri Co. v. Atlantic Fertilizer Co., 129 Md. 42, 52, 98 A. 365, Ann. Cas.1918D, 396; Denton Bros. v. Gill & Fisher, 102 Md. 386, 406, 62 A. 627, 3 L. R.A.,N.S., 465. If the carrier owed the duty to the shipper or the ship, it was entitled to perform it with its own facilities of transportation. Atchison, T. & S. F. Ry. Co. v. United States, 232 U.S. 199, 214, 34 S.Ct. 291, 58 L.Ed. 568.

To summarize on this phase of the case, I conclude as a matter of law that (1) it was the duty of the rail carrier in making delivery to bring the cars within reach of the ship's tackle; (2) that the particular method of doing this was subject to the reasonable convenience of the Railroad and the ship as affected by the physical conditions; (3) that if requested by the ship the rail carrier was obliged to place a single car within reach of the ship's tackle; (4) that if the convenience of the ship or its stevedoring employes in economizing time in loading or unloading required the placing of cars in series rather than singly, and this in turn for the further convenience of the stevedoring companies necessitated intermediate shifting of the cars by the stevedores, the latter was a service not required to be performed by the rail carrier; and (5) which it could discontinue at will although long theretofore prevailing (6) upon substitution of further shifting of the cars by the rail carriers' own motive power as requested from time to time by the ship, with such frequency and expedition only as was reasonably consistent with normal operating conditions of the rail carrier.

For all these reasons I conclude that the plaintiff is not entitled to recover in this case and the clerk of the court is therefore directed to enter judgment for the defendant with taxable court costs to be paid by the plaintiff.