## ARMOUR & COMPANY *v.* ALTON RAILROAD CO.
### ET AL.

No. 293. Argued January 14, 1941.—Decided February 3, 1941.

*Mr. Paul E. Blanchard,* with whom *Messrs. Chas. J. Faulkner, Jr.* and *John Potts Barnes* were on the brief, for petitioner.

*Mr. Douglas F. Smith,* with whom *Messrs. Kenneth F. Burgess* and *Frank H. Towner* were on the brief, for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

This litigation is the latest episode of a long struggle involving the meat packers, the railroads, and the Union Stock Yard and Transit Company of Chicago.[1] Basically, on the merits the issue here presented is whether

---

[1] See *Adams v. Mills,* 286 U. S. 397; *Atchison, T. & S. F. Ry. Co. v. United States,* 295 U. S. 193.

Armour and Company, one of the packers, is correct in its contention that under the facts of this case the railroads must deliver its shipments of livestock at such a location and in such a manner that it need pay no "yardage charge" to the Stock Yards Company. The case is here on certiorari (311 U. S. 627) from the Court of Appeals for the Seventh Circuit,[2] which affirmed a District Court order dismissing Armour's complaint against the railroads.[3] The ground on which the Circuit Court affirmed was that the issues involved presented administrative problems, necessitating primary resort to the Interstate Commerce Commission.[4] The sole question we find it necessary to decide is whether the Circuit Court was correct in this conclusion.

It is petitioner's contention that its complaint showed a wilful failure and refusal on the part of the railroads to deliver livestock to petitioner in accordance with the railroads' contractual and common law duties; that instead of delivering to petitioner, the railroads delivered to the Stock Yards Company—contrary to petitioner's express direction—with full knowledge that the Stock Yards Company would not effect a delivery to petitioner without first exacting a yardage charge in addition to the agreed transportation charges set out in the railroads' regular published tariffs; and that petitioner's right to proceed in the courts for such a breach of duty exists under the provisions of 49 U. S. C., §§ 9 and 22.[5]

---

[2] 111 F. 2d 913.

[3] 27 F. Supp. 625.

[4] The District Court, in addition to relying on this ground, held that the complaint should be dismissed for failure to join the Stock Yards Company as a defendant, and for failure to obtain consent of court to bring suit against railroads which were in receivership. We express no opinion on the correctness of those holdings.

[5] Section 9 provides for concurrent jurisdiction of the Interstate Commerce Commission and the courts "for the recovery of the damages for which such common carrier may be liable under the

But respondents contend, and both courts below held, that the issues tendered by the complaint are not so simple as petitioner would have them seem. Their view is that adjudication of the issues presented relates to such complex transportation problems that determination of the legal questions must necessarily be preceded by the consideration of extensive evidence in a specialized field, and that decision of such questions is by statute vested exclusively in the Interstate Commerce Commission.[6] Since the cause was dismissed without answer or evidence, it is on the basis of the allegations of the complaint that we must apply the controlling law.

The factual situation, according to the complaint, is as follows: For many years prior to 1933 the railroads held themselves out as ready to transport goods to "Union Stock Yards, Illinois," and petitioner shipped to itself at that station much livestock from various points of origin in the United States. None of the railroads own or operate a depot or terminal facilities for the unloading and delivery of livestock, but all of them jointly have long had arrangements with the "Union Stock Yard and Transit Company," a public stock yard, for the use of its terminal facilities. This public stock yard is a common carrier, subject in some respects to the jurisdiction of the Interstate Commerce Commission, and in others to that of the Secretary of Agriculture. Its unloading charges, fixed according to a tariff published and on file with the Interstate Commerce Commission, are collected by the railroads from petitioner and other shippers and are in

---

provisions of this chapter. . . ." Section 22 provides that "nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies; . . ."

[6] Cf. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.*, 230 U. S. 247.

turn paid to the Stock Yards Company.[7]  This charge, however, does not include payment for use of the facilities after unloading and before delivery to consignees, or for any services then performed.  To cover these items, the Stock Yards Company collects an additional charge, since 1921 contained in a tariff filed with the Secretary of Agriculture,[8] and it is this charge which is at the root of the present controversy.

In 1933 petitioner, without resort to the Interstate Commerce Commission, demanded that the railroads alter this long-standing practice so as to relieve it from payment of this additional charge.  Pursuant to its purpose, petitioner notified the railroads that it would not thereafter utilize any services after unloading; asked that tender of delivery be made to it immediately after unloading so that it could remove its stock to its own plant; avowed its readiness thereafter to accept delivery at such "reasonable and proper delivery pens of the carrier" at "Union Stock Yards, Illinois," as might be provided by the railroads; demanded that the railroads either directly or through their agent, the Stock Yards Company, deliver the consigned stock to petitioner without any charges except those paid for transportation; and declared that delivery to the Stock Yards Company contrary to petitioner's demand would be treated as a conversion of property for which the railroads would be held responsible.  Notwithstanding this demand the railroads continued to deliver petitioner's consignments to the

---

[7] Special statutory provision requires railroads delivering at public stockyards to unload the livestock.  "Transportation . . . of ordinary livestock . . . destined to or received at public stockyards shall include . . . delivery . . . into suitable pens. . . ."  49 U. S. C. § 15 (5).

[8] Packers & Stockyards Act, 42 Stat. 159, 7 U. S. C. § 181 *et seq.* Before 1921, this charge was fixed by the Stock Yards Company itself.

Stock Yards Company and that Company, over petitioner's protest, continued to exact the controverted charge. The railroad companies knew that delivery to petitioner would only be made by the Stock Yards Company on Company property and with no means of egress save by crossing other property of the Company, for which privilege a charge would be exacted.

The complaint adds that in spite of this demand the railroads have "continuously refused to provide or establish by lease or otherwise at their said common station, Union Stock Yards, Illinois, any depot or platforms, pens or facilities" where petitioner might accept delivery of its stock without payment of the controverted charge, and have also "failed to make any arrangement with its said agent under . . . which the plaintiff might have free ingress . . . and egress . . . to a public street." Specifically, two breaches are alleged: (1) a breach of duty in failing "to provide reasonably convenient, accessible and safe unloading pens, at the said common depot or station, at which such livestock could be tendered to plaintiff"; and (2) a breach of contract in "failing to afford to plaintiff an opportunity of receiving its livestock and of removing the same with reasonable promptness from the unloading pens used by defendants at Union Stock Yards, Chicago, Illinois, or from any point at which delivery thereof is tendered, . . ." The contract relied on provides "That the carrier has received from the shipper . . . the livestock . . . consigned and destined as indicated below, which the carrier agrees to carry to its usual place of delivery at said destination, . . ." The usual place of delivery for livestock shipped to Union Stock Yards, Chicago, Illinois, and indeed the only place of delivery ever utilized at that station so far as the complaint shows is the public stock yards.

The complaint concludes with a prayer for affirmative relief: an adjudication that petitioner is entitled to de-

livery free of any charges other than those filed with the Interstate Commerce Commission; a mandatory injunction to require such delivery; and an accounting for those charges paid under protest.

This statement of the facts alleged in the complaint reveals that there are many questions relating to complex transportation problems that must be solved as a prerequisite to a determination of whether the railroads, in violation of contracts or governing laws, have failed properly to deliver petitioner's livestock.[9] For illustration:

*First.* At what point did the common carriers' duty to transport come to an end? Neither the statute nor any applicable principle of governing law can be said to mark this boundary, under all circumstances and conditions and in all cases.

*Second.* Under the allegations of the complaint, the practice of delivering livestock to the public stock yards in Chicago, and the practice of the Stock Yards Company of exacting a charge from consignees, are longstanding customs. Shippers, railroads, the Stock Yard Company, and the Interstate Commerce Commission alike have left these practices in effect over a long period of years. If use of the terminal facilities for egress to the street after unloading of livestock is a part of transportation, as petitioner alleges, and if this use is a service for which reasonable compensation is justified, it cannot be doubted that this charge, like the unloading charge,

---

[9] Cf. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Mitchell Coal & Coke Co.* v. *Pennsylvania R. Co.*, 230 U. S. 247; *United States* v. *American Sheet & Tin Plate Co.*, 301 U. S. 402. Petitioner relies on *Covington Stock-Yards Co.* v. *Keith*, 139 U. S. 128. But that case, a suit originally instituted before Congress adopted the Interstate Commerce Act, is not determinative of the respective jurisdictions of the courts and the Commission in this case.

is a part of that reasonable transportation rate determination of which is committed to the jurisdiction of the Interstate Commerce Commission. And before such long-standing transportation customs can be held illegal, it is of course necessary that evidence be heard.

*Third.* If the railroad delivers through the public stock yards, and petitioner's position is sustained, the railroad must necessarily absorb the additional charge. Under the complaint, this would be upon the basis that the railroad had not fully performed its transportation service. Yet the tariff charges for shipping petitioner's livestock were based upon the long-standing custom in which petitioner and the other packers had acquiesced. The railroad is entitled to receive and the shipper is required under the statute to pay a just and reasonable rate. A court judgment in favor of petitioner would reduce the compensation of the railroads for the performance of their services, and would in effect constitute a readjustment of their rate schedules.

*Fourth.* If, as petitioner insists, it is the duty of the railroads to provide terminal facilities which they do not now own, possess or control, a drastic change might have to be accomplished by them. Property might have to be acquired, expensive facilities might have to be secured, and correspondingly, rates might have to be adjusted. The need for such steps raises a transportation problem of the greatest magnitude, involving many intricate considerations such as must always play a part in evaluating a claim that new depots and facilities are necessary.

*Fifth.* The complaint shows that there is no provision in the tariff which would authorize the railroads to make refunds to petitioner of those charges paid by petitioner to the Stock Yards Company. Such refunds, if made, would be in the nature of special allowances not authorized by the tariff. A court's adjudication of this question in this case would not uniformly benefit all shippers

for whom respondents have transported livestock. Whether or not such a refund would amount to a discrimination should be determined by studies such as those the Interstate Commerce Commission is especially empowered to make.

*Sixth.* The complaint alleges that petitioner is willing to accept delivery at any point in the station area. What the station area embraces is not defined. Whether there is property in the area on which the railroads could erect pens is not shown. To decide this issue would require a court to define the boundaries of a station named in a tariff approved by the Interstate Commerce Commission.

The complexities of the situation here presented are graphically illustrated in the companion case of Swift & Co. *v.* Alton R. Co., 238 I. C. C. 179. ` Swift, one of Armour's competitors, took its petition for alteration of the same long-standing practice directly to the Commission. That expert body found it a necessary prerequisite to decision to have a trial examiner conduct extensive hearings, compiling in the process a record of 5 volumes, 1147 pages, and numerous exhibits.[10]

The principles making up the so-called primary jurisdiction doctrine are well settled. This is obviously a case for their application. The decision below is accordingly

*Affirmed.*

---

[10] For instances where this Court has referred to the Commission's reports as indicative of the administrative problems involved in particular cases, see *Loomis* v. *Lehigh Valley R. Co.,* 240 U. S. 43, 50–51; *Northern Pacific Ry. Co.* v. *Solum,* 247 U. S. 477, 483.