### WHITAM v. CHICAGO, R. I. & P. RY. CO. et al.

### No. 661.

District Court, N. D. Texas,
Amarillo Division.

May 31, 1946.

W. E. Fitzgerald and Milburn E. Nutt, both of Wichita Falls, Tex., for plaintiff.

Thompson, Walker, Smith & Shannon, John A. Kerr, and Barwise & Wallace, all of Fort Worth, Tex., and R. A. Stone, of Amarillo, Tex., for defendants.

WILSON, District Judge.

Whitam filed this suit in the State district court of Dalhart, Texas. Defendants, the Railroads, removed it to this Court. In due time they also filed a motion to dismiss, on the ground that the State court had no jurisdiction to try the suit, and consequently, this Court had none; that it is an administrative matter and that primary jurisdiction is with the Interstate Commerce Commission and not with the courts. That motion only is being considered here.

Whitam during the war, for Government construction, shipped concrete materials, sand, gravel and crushed stone, via those railroads to Dalhart, Texas. He sues for $6,717.25 in damages, which he says were suffered by him through an overcharge of freight on such materials. The motion arises under, and involves a construction of, an order entered by the Interstate Commerce Commission known as "Service Order No. 144", which was in effect at the time in question, but not now, since it was a war emergency regulation. As I view it, the material parts of that order are as follows: "S 95.25 Carloads of sand, gravel, or aggregate destined to Dal-hart, Hitt, Twist, Wagner, or Ware, Texas, or any other point near Dalhart, for use on government construction at Dalhart, not to be weighed. * * * except that a limited number of cars may be weighed as is necessary to obtain average weights."

As to what the railroads actually did under that rule, plaintiff alleges this: "Sixth: Plaintiff avers that under said Service Order No. 144 the defendant, The Fort Worth and Denver, and the trustees herein were required to obtain average weights and to weigh enough of cars, including the small and large, to obtain an average weight so that no injury would result to the plaintiff or to the defendant, but plaintiff further alleges in this respect that the scheme and procedure adopted and used by said defendant, Fort Worth and Denver, and trustees herein did not result in obtaining the average weight of all cars involved as was necessary under said Order; that average cars were not selected for weighing or for averaging together in order to obtain average weights. That in most instances, and on most involved days, the first three, (3), cars behind the engine of the first gravel train, and the first two, (2), behind the sand train to enter Dalhart, were by design and in fact heavier in weight than the average of all other cars of gravel and sand shipped on the involved day as well as during the entire scheme and period of procedure; that said plan was known to the materialmen who loaded the cars, and were interested therein, and defendants herein who were also interested and thus selected the cars for sand and gravel respectively that were heavier than the average of said trainload, and should not have been applied as the weight of all cars, * * *."

Plaintiff does not contend the rule is unfair or, in itself, discriminatory, or that it is an unreasonable rule. He simply claims that defendants did not comply with the plain, unambiguous provisions of the rule, but violated it; that the railroads arbitrarily selected cars, generally two or three cars right behind the engine to weigh, and which the plaintiff says were not representative, either as to materials contained, or the size of the cars, as would reflect average

weights; that such a system of not living up to the rule resulted in a loss to plaintiff, in that it resulted in higher weights to his cars than were actually the average weight of carloads in the train; that the result was an aggregate bigger freight bill than he was justly due to pay, but which he did pay, and by this suit seeks to get back. It must be kept in mind here that the complaint is not against the freight rate, nor against the rule on any ground, nor is an injunction sought against a practice. It is not to correct anything for the future, but passed alleged errors. It is a complaint to the effect, that plaintiff was cheated by defendants' erroneous or fraudulent system of weighing, which resulted in a false average of weights. The essence of plaintiff's suit is simply for damages, for torts committed. The ascertainment of damages, if any, is not an exact science whatever the trial agency may be.

Defendants' position, on the other hand, makes the plaintiff's case something other than what he pleads it. This excerpt from their excellent brief reflects their position, as follows:

"The defendant carriers are asking that this cause of action be dismissed because primary jurisdiction of the questions raised as between the plaintiff and the carriers is in the Interstate Commerce Commission, and not in the State court in which this suit was originally filed, and therefore the State court, having no jurisdiction, this Court cannot take jurisdiction of the subject matter of this case.

"The rule complained of in Service Order No. 144 became effective August 7, 1943, and remained in effect until all of the shipments of material upon which damages are sought was moved from origin to destination. The question of whether or not the rule or practice which was made by the defendant carriers, was an arbitrary, discriminatory or illegal rule, which if enforced would result in damages to the plaintiff, is one calling for administrative action on the part of the Interstate Commerce Commission * * *."

Defendants are right, if their premise is right. But plaintiff does not contend it was the enforcement of the rule which resulted in his damage. But because of defendants'

failure to enforce it according to its letter, not that it is arbitrary or unreasonable. Plaintiff's petition in no way complains of Service Order No. 144.

The Supreme Court has pretty well answered defendants' position in the Great Northern R. Co., et al. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 478, 66 L.Ed. 943. The plaintiff relies on this decision from which I quote, as follows:

"The contention that courts are without jurisdiction of cases involving a disputed question of construction of an interstate tariff, unless there has been a preliminary resort to the Commission for its decision, rests in the main, upon the following argument: The purpose of the Act to Regulate Commerce * * * is to secure and preserve uniformity. Hence, the carrier is required to file tariffs establishing uniform rates and charges, and is prohibited from exacting or accepting any payment not set forth in the tariff. Uniformity is impossible, if the several courts, state or federal, are permitted, in case of disputed construction, to determine what the rate or charge is which the tariff prescribes. To insure uniformity the true construction must, in case of dispute, be determined by the Commission.

"This argument is unsound. It is true that uniformity is the paramount purpose of the Commerce Act. But it is not true that uniformity in construction of a tariff can be attained only through a preliminary resort to the Commission to settle the construction in dispute. Every question of the construction of a tariff is deemed a question of law; and where the question concerns an interstate tariff it is one of federal law. If the parties properly preserve their rights, a construction given by any court, whether it be federal or state, may ultimately be reviewed by this court either on writ of error or on writ of certiorari; and thereby uniformity in construction may be secured. Hence, the attainment of uniformity does not require that in every case where the construction of a tariff is in dispute, there shall be a preliminary resort to the Commission."

The Railroads chiefly rely on the same decision, but a different part of it, as follows: "Whenever a rate, rule, *or practice*

is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. *But ordinarily the determining factor* is not the character of the function, but the *character of the controverted question and the nature of the enquiry necessary for its solution.* To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function." (Emphasis mine.)

The courts have been explaining parts of that decision ever since it was written. "Or practice is attacked as unreasonable or as unjustly discriminatory" seems to be the confusing phase of the opinion. It must be remembered here, we are bound by plaintiff's pleadings, and must look only to his pleadings for what are, or properly would be the "controverted question and the nature of the inquiry necessary for its solution". That plaintiff complains expressly of "a practice" of the railroads is not found in his pleadings. The motion to dismiss can introduce no question of fact, but only can raise such questions as can be raised from the face of plaintiff's petition. We are bound by the facts set out in that petition. In effect, defendants say the plaintiff's petition is complaining of the practice of the carriers, any regulation or decision as to which they claim is purely administrative, and therefore, primarily for the Commission. Does plaintiff's petition construed as a whole, charge the railroads with "a practice" such as comes within the meaning of "practice" as used in the quoted decision? I do not think it does. As such, plaintiff does not complain of the rate whatsoever. Nor, as heretofore stated, does he in any sense complain of the rule. The word "a practice" as used in the decision, or used anywhere properly, implies systematic doing of the acts complained of, and usually as applied to carriers and shippers generally. It appears to me that this question, or like questions, must be decided by the peculiar

facts or alleged facts of each case. Plaintiff's contention is, he was cheated in the over weights, not that the applied rates were in any way improper. And, as far as the petition goes, he makes it an individual matter between himself and the defendants. He does not make it a practice even between them. Specific acts of violation of this rule does not constitute "a practice". Plaintiff's petition does not disclose that he acquiesced in this alleged wrong, or when he discovered he had been defrauded as to weights. Recognized dictionaries as well as decisions as to the meaning of "practice" govern us here. Plaintiff does not plead that these over weights occurred every day defendants hauled his material. He says:

"*That in most instances, and on most involved days,* the first three (3) cars behind the engine of the first gravel train, and the first two, (2), behind the sand train to enter Dalhart, were by design and in fact heavier in weight than the average of all other cars of gravel and sand shipped *on the involved day* as well as during the entire scheme and period of procedure; that said plan was known to the materialmen who loaded the cars, and were interested therein, and defendants herein who were also interested and thus selected the cars for sand and gravel respectively that were heavier than the average of said trainload, and should not have been applied as the weight of all cars." (Emphasis mine.)

As far as plaintiff's pleadings go, no other shipper was mentioned or involved, nor does it disclose how long this emergency hauling and procedure lasted. It is assumed defendants, if called on to plead to the merits, would deny the ugly charges made by plaintiff. Anticipating that situation, the issue or issues involved would be in no way administrative, but purely judicial. Its decision would require no expert or technical knowledge. If so, the Commission, of course, would be more capable than the court. As to whether the terms of this plain, unambiguous rule is violated as relates to what is fair and honest, etc., in every day business dealings, the Commission possesses no superior ability or knowledge over a court or a jury. Too,

the Commission possesses no power to give relief, as do the courts, for any alleged past deliberate violations of its rule.

I am not saying decision is an easy matter here. Distinctions must be made. The difficulties resolve themselves largely into one question, as to what is the meaning and significance of the phrase, "or practice". The case of Armour & Co. v. Alton R. Co., 7 Cir., 111 F.2d 913, and affirmed 312 U.S. 195, 61 S.Ct. 498, 499, 85 L.Ed. 771, is also cited by defendants' counsel. That decision throws more clear light on the meaning of "or practice", than any decision cited. It illustrates better than I possibly could, what is meant by "or practice" as that term is used by the court in the Great Northern Railway Co. case supra.

In that case all of the courts from the district court up, decided it was a "practice" involved there, and that the Interstate Commerce Commission primarily had jurisdiction. And such practice was attacked as being unjust and discriminatory, bringing it squarely under the Great Northern Railway Company case. The Armour & Co. case is quite lengthy, and I will quote as little from it as possible. It involved payments by Armour & Company, as a Chicago Stock Yard yardage fee to the carriers, including the Alton Railroad Company, as part of their line haul rate. It had been carried on for time immemorial, and carriers, yards, packing houses, shippers, and everybody involved, had acquiesced in the rule, and lived under it. Finally Armour & Company commenced to object to it, and only paid thereafter under protest. Finally suit was filed against the defendant to stop it, and to recover back payments, etc. The Supreme Court also held the primary jurisdiction was with the Commission. I quote from the case, as follows:

"This litigation is the latest episode of a long struggle involving the meat packers, the railroads, and the Union Stock Yard and Transit Company of Chicago. Basically, on the merits the issue here presented is whether Armour and Company, one of the packers, is correct in its contention that under the facts of this case the railroads must deliver its shipments of livestock at such a location and in such a manner that it need pay no 'yardage charge' to the Stock Yards Company. * * *

"The factual situation according to the complaint is as follows: For many years prior to 1933 the railroads held themselves out as ready to transport goods to 'Union Stock Yards, Illinois', and petitioner shipped to itself at that station much livestock from various points of origin in the United States. None of the railroads own or operate a depot or terminal facilities for the unloading and delivery of livestock, but all of them jointly have long had arrangements with the 'Union Stock Yard and Transit Company', a public stock yard, for the use of its terminal facilities. This public stock yard is a common carrier, subject in some respects to the jurisdiction of the Interstate Commerce Commission, and in others to that of the Secretary of Agriculture. Its unloading charges, fixed according to a tariff published and on file with the Interstate Commerce Commission, are collected by the railroads from petitioner and other shippers and are in turn paid to the Stock Yards Company. This charge, however, does not include payment for use of the facilities after unloading and before delivery to consignees, or for any services then performed. To cover these items, the Stock Yards Company collects an additional charge, since 1921 contained in a tariff filed with the Secretary of Agriculture, and it is this charge which is at the root of the present controversy.

"In 1933 petitioner, without resort to the Interstate Commerce Commission, demanded that the railroads alter this long-standing practice so as to relieve it from payment of this additional charge. * * *

"The complaint concludes with a prayer for affirmative relief; an adjudication that petitioner is entitled to delivery free of any charges other than those filed with the Interstate Commerce Commission; a mandatory injunction to require such delivery; and an accounting for those charges paid under protest. * * *

"The complexities of the situation here presented are graphically illustrated in the companion case of Swift & Co. v. Alton

R. Co., 238 I.C.C. 179. Swift, one of Armour's competitors, took its petition for alteration of the same long-standing practice directly to the Commission. That expert body found it a necessary prerequisite to decision to have a trial examiner conduct extensive hearings, compiling in the process a record of 5 volumes, 1147 pages, and numerous exhibits.

"The principles making up the so-called primary jurisdiction doctrine are well settled. This is obviously a case for their application. The decision below is accordingly

"Affirmed."

I overrule the motion to dismiss. An order may be drawn accordingly.