William N. FEINSTEIN and Bernard Fatell, co-partners doing business under the firm name and style of Wm. N. Feinstein & Co., Plaintiffs,

v.

The NEW YORK CENTRAL RAILROAD CO., Defendant.

United States District Court
S. D. New York.

Feb. 10, 1958.

On Submission of Conflicting Forms of Judgment March 12, 1958.

Norman Coplan, New York City, for plaintiffs.

Edward F. Butler, New York City, for defendant.

HAND, Circuit Judge.

The plaintiffs are produce merchants in New York City. One of the chief products in which they deal is onions, which are shipped to the plaintiffs from various states, and which the defendant delivers at Pier 17 in New York City. The cars in which they come are moved by various

carriers from the point of origin to the point of destination under a line-haul rate, and the onions are either the property of the plaintiffs, or are shipped to them as agents to be handled on consignment. When fresh fruits and vegetables come to New York from the south and west, the cars are put on car floats at Jersey City, ferried across the Hudson River, and unloaded by the rail carriers at "pier stations" in New York. The delivering carriers, including not only the defendant, but the Pennsylvania Railroad Co., the Erie Railroad Co., and the Baltimore & Ohio Railroad Co., do not have sufficient "team tracks" in the lower part of the City upon which to place the cars until the consignees can unload them. To avoid the expense of furnishing enough "team tracks" for that purpose the carriers do not let the consignees unload the cars as is ordinarily the practice, but ferry them across the Hudson River in car floats which they make fast to "pier stations" in the lower part of the City. It is not possible for the consignees to put their trucks alongside the floats and unload the fruits and vegetables themselves, so the carriers unload the goods and place them where they are accessible to the consignees. The action at bar is to recover charges collected by the carriers for this service. Various shippers and others protested against the charge in 1947 on the ground that delivery was part of the defendant's transportation service and should be included in the line-haul rate. These protests the Commission considered under Investigation and Suspension Docket No. 5500, and on October 4, 1948, ruled that the proposed charge was "just and reasonable," (272 I.C.C. 648). It became effective on November 1, 1948; but on petition for rehearing the Commission re-opened the proceeding, and after additional hearings found on May 7, 1952 (286 I.C.C. 119) that the charges were not shown to be "just and reasonable," cancelled the "schedules" and discontinued the proceeding, but "without prejudice to the establishment of charges in conformity with" certain rates lower than those in force at the time. Acting

upon the permission so given, the defendant filed a schedule, publishing rates at the authorized amounts; and after an unsuccessful petition for a rehearing, the plaintiffs in September, 1952, filed a complaint with the Commission under § 13 (1) of the Interstate Commerce Act, 49 U.S.C.A. § 13(1); against the reduced charges, which the Commission dismissed saying that "the circumstances and conditions with respect to the approved unloading charges have not materially changed since the same issues were decided by the Commission" in the original proceeding.

Thereupon an action was started in Florida in a "three-judge" district court to annul the orders of 1948 and 1952, which that court dismissed on August 31, 1953 (Florida Citrus Commission v. United States, D.C., 114 F.Supp. 420). The plaintiffs appealed from this judgment to the Supreme Court which vacated the judgment and remanded the several proceedings involved to the Commission for further proceedings on July 7, 1954. (Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L. Ed. 1015.) On August 23, 1954, the Commission re-opened the proceedings and the complaints, and concluded its proceedings on June 28, 1956, by finding "that the charges in issue are not shown to be just and reasonable. The prior findings are modified accordingly." The schedules establishing the charges were cancelled on October 16, 1956, and the action at bar to recover those paid in the past was begun on December 3, 1956.

The first point to decide is whether the plaintiffs' claim for reparations requires an express finding by the Commission that the unloading charges collected by the defendant were unlawful, during the period not barred by the Statute of Limitations (§16(3) of the Act, 49 U.S. C.A. § 16(3)), or whether that result necessarily follows from the Commission's order of July 28, 1956, cancelling the charges for the future. The plaintiffs' argument is that no such finding was necessary because the charges were for a service that was part of the deliv-

ery and that delivery: i. e., making the goods accessible to the consignee, is included in the line-haul rate. The charges being therefore in excess of an established rate, were unlawful per se and recoverable under § 9 of the Act, 49 U.S. C.A. § 9 like any other charge in excess of a published rate. That was the position of the minority of the Supreme Court in Secretary of Agriculture v. United States, supra, 347 U.S. at page 655, 74 S.Ct. at page 832; but it was at variance with the decision of the majority. Not only did the majority refuse to grant judgment for the plaintiffs which, so far as I can see, would have been inevitable, if such charges were necessarily attributable to services covered by a line-haul rate, but the Court's reasoning presupposed that the Commission might validly have supported the charges, if the carriers had shown them to be "just and reasonable." It is true that Frankfurter, J., said on page 652 of 347 U.S., on page 831 of 74 S.Ct. that "the normal course * * * would have been to reexamine the sufficiency of the line-haul rate, or to initiate a new division of the existing line-haul rate," nevertheless "the Commission was not precluded from following a procedure fairly adopted to the unique circumstances of this case. The Commission may not unnaturally have felt that it would be undesirable to revise the line-haul rate with its inevitable effect on the entire tariff structure, in order to deal appropriately with the special localized situation presented at the New York piers. Or the Commission might well have thought that a redivision of the line-haul rate would not be appropriate for the substantial additional cost here involved." Again on page 653 of 347 U.S., on page 831 of 74 S.Ct.: "We do not know whether the Commission has disregarded its own findings that the unloading here is a prerequisite to delivery of the goods; or whether, in order to meet an unusual situation, the Commission has modified the normal doctrine that delivery is the responsibility of the carrier * * * or whether * * * a service necessarily encompassed by the line-haul rate" may

be "separately restated without examining the sufficiency of the line-haul rate to cover it."

I can only conclude that the Court refused to hold that the charges were necessarily unlawful, and implied that the Commission might allow them as an addition to the line-haul rate if it found that, all things considered they, plus the line-haul rate, were no more than "just and reasonable" for the services rendered. This is confirmed by what it said on page 647 of 347 U.S., on page 828, of 74 S.Ct.: "The general rule is that it is the responsibility of the carrier, as part of the transportation service covered by the line-haul rate, to 'deliver' the goods by placing them in such a position as to make them accessible to the consignee, * * * [but] these are not inflexible rules. The law recognizes and reflects the practicalities of transportation by rail and the diversities to which they give rise."

However, although the Commission's order of 1956 put an end to the charges for the future, it does not follow that it also decided that they had been unlawful during the period left open by § 16(3). Even in a suit in equity a decree for an injunction speaks from the date of its entry, and before there can be an accounting for past profits or damages the court must find that the defendant had been guilty in the past of the same wrong. It is true that usually it is possible to infer this from the evidence upon which the injunction itself rests, and perhaps were this a suit cognizable in all its aspects by the District Court, the evidence before the Commission on this proceeding would not only have justified but required a finding that the charges had as little support when the plaintiffs paid them as when the Commission cancelled the schedules in 1956. However, the Commission certainly at no time so found, unless its concluding phrase must be so construed: "The prior findings are modified accordingly." That is a cryptic phrase at best, and in George A. Hormel & Co. v. Union Pacific Railway Co., 289 I.C.C. 691, 697, the

Commission in discussing its use in a prior proceeding, declared that "the rates prescribed in the proceeding referred to were for future application only, and that the Commission modified in certain respects, rather than affirmed its prior findings unconditionally made. Recognition of such a modification as a basis for an award of reparation has no justification." Certainly I must take as authoritative the Commission's interpretation of its own idiom.

■ No action for reparations will lie under § 9 when the plaintiffs' right depends upon the reasonableness of charges paid, unless the Commission has determined that the charges were not "just and reasonable."[1] That is an issue which courts may not determine unaided, because the questions involved require a specialized acquaintance with the nexus of conflicting interests involved in transportation that courts do not have and cannot acquire. This has been declared again and again, not only as to the Interstate Commerce Commission but as to other administrative tribunals. "Matters which call for technical knowledge pertaining to transportation must first be passed upon by the Interstate Commerce Commission before a court can be invoked." Rochester Telephone Corp. v. United States, supra, 307 U.S. 139, 59 S.Ct. 761. It follows from the established doctrine that administrative tribunals in making their findings are free, and indeed required, to draw upon the entirety of their specialized experience, which is necessarily undisclosed in the record. It would not therefore have served the plaintiffs, if they had shown that all facts, susceptible of proof in court, had remained unchanged between 1948 and 1956. That would not have proved that the charge should be deemed "unjust and unreasonable" throughout the period in question, when that evidence is read against the background of railway transportation as the Commission knew it. Courts must accord to such tribunals a latitude of inference, an acquaintance with the relevant major premises, as inaccessible to judges as are those upon which a doctor founds his diagnosis from the evidence admitted at a trial. Thus the complaint at bar must be dismissed unless it is possible to stay final judgment, and allow the plaintiffs to seek a ruling by the Commission that the charges were "unjust and unreasonable" at the time that the plaintiffs paid them. This the Commission's order of July 28, 1956, did not find and, indeed, the plaintiffs had never at any time claimed. Moreover, before entering such a judgment the plaintiffs must show (1) whether it is permissible to suspend an action for reparations in order to allow such a proceeding before the Commission to go on, pendente lite, and (2) whether it is still open to the Commission to decide the point in spite of its orders of 1948 and 1952. I shall first consider the second of these questions.

■ In Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348, the Commission had originally "ordered the establishment of a rate not exceeding" 96.5 cents which was less than the rate then being charged. This order was passed on June 22, 1921, and was followed by another order in a separate proceeding begun on November 1, 1922, to which the plaintiff was not a party and in which on February 5, 1925, the Commission fixed the rate of 71 cents. The shippers in compliance with the first order had already reduced the rate, first to 96 cents, and later to lower rates though not as low as 71 cents. The shippers' action was to recover the excess above 71 cents that they had paid between February 21, 1923 and February

---

1. Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943; Rochester Telephone Corp. v. United States, 307 U.S. 125, 135, 59 S.Ct. 754, 83 L.Ed. 1147; Armour & Co. v. Alton Railway Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771; United States v. Interstate Commerce Commission, 337 U.S. 426, 437, 69 S.Ct. 1410, 93 L.Ed. 1451.

10, 1925, when the carrier reduced the rate to 71 cents. The Supreme Court held that the first rate, established in June 1921, was an exercise of "legislative" power delegated by Congress; and for that reason it held that any payments exacted while it was in force: i.e., until February 5, 1925, were necessarily as lawful as they would have been if Congress had "established" them. To allow the shippers to recover them by way of reparation was to compel the carrier to repay what had been its own, which would be not only contrary to the statute, but of doubtful constitutionality. The Court added, however, by way of caution, (284 U.S. at page 386, note 15, 52 S.Ct. at page 185) that a rate might not have "the force of a statute" for various reasons. These of course included any violation of the Fifth Amendment, as indeed would have been true of a statutory rate; but in addition "the courts will examine the question whether the administrative agency of the Legislature has exceeded its statutory powers * * * or has based its order upon a finding without evidence or upon evidence which clearly fails to support it." This language assumes that a finding of the Commission is not "legislative" and therefore a conclusive protection to the carrier, not only when it is without any evidence but also when the evidence "clearly fails to support it." In the case at bar the Commission's order of 1952 was not a "legislative" act, not indeed because the evidence failed to support it, but because one condition upon the exercise of the Commission's "legislative" power was that it should make adequate findings; and, although the Supreme Court did not hold that final result —the charge—was unlawful, it did hold

that the order that prescribed or approved it did not fulfill this condition upon which the validity as all orders of the Commission depended. For these reasons it will not be necessary to decide the controversy about the effect of an "approved" rate as contrasted with a "prescribed" rate.

■ There remains the first question I suggested: i.e., whether a proceeding before the Commission to determine the rate before 1956, may be interpolated into an action under § 9 to recover reparations. As I have just said, the decision of the Supreme Court in Secretary of Agriculture v. United States, supra, did not hold that the charge was unlawful, although the order that affected to declare it lawful was invalid as an authentic exercise of legislative authority. There never was any authoritative order during the period for which the plaintiffs are demanding reparations. May they maintain an action in the absence of any such finding by obtaining an order of the Commission, pendente lite? Before 1951 it was several times held permissible to suspend the decision of an action for reparations, and allow the plaintiffs to file such a complaint with the Commission under § 13(1) on which an award could be made under § 16(1);[2] but in that year the Supreme Court decided the appeal in Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912, and the defendant argues that this course is no longer open to shippers suing for reparations. I do not agree. The recovery denied in that case was of reparations for overcharges under the Federal Power Act (Title 16, U.S.C.A. §§ 791a–825r), which does not give the Federal Power Commission authority to enter-

2. *Mitchell Coal & Coke Co.* v. *Pennsylvania Railway Co.*, 230 U.S. 247, 267, 33 S.Ct. 916, 57 L.Ed. 1472; *Morrisdale Coal Co.* v. *Pennsylvania Railway Co.*, 230 U.S. 304, 314–315, 33 S.Ct. 938, 57 L.Ed. 1494; *General American Tank Car Corp.* v. *El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 84 L. Ed. 361; *Smith* v. *Hoboken R. R.*, 328 U.S. 123, 133, 66 S.Ct. 947, 90 L.Ed. 1123; *Thompson* v. *Texas Mexican Railway Co.*, 328 U.S. 134, 151, 66 S.Ct. 937, 90 L.Ed. 1132; *United States* v. *Kansas City Southern Railway*, 8 Cir., 217 F.2d 763, 776.

tain a complaint for reparations: the consumer must be content with the rates as fixed except for charges in future. The action was by one electric company against another to recover overcharges; and some determination was necessary that the past rates had been "unreasonable," a determination that only the Commission could make. The Court held that, as the Commission could not grant or deny reparations, it could not decide whether past charges were "unreasonable"; "we know of no case where the court has ordered reference of an issue which the administrative body would not itself have jurisdiction to determine in a proceeding for that purpose." 341 U.S. at page 254, 71 S.Ct. at page 696. In addition, earlier in its opinion the Court said that, although it had "directed lower federal courts to stay their hands pending reference to an administrative body of a subsidiary question," it had never "directed a court to retain a case in which it could not determine a single one of its vital issues." In the case at bar two questions at any rate may be determined in this court, and should be there determined before, rather than after, any further proceedings before the Commission are held. One of these I have just considered: i.e., whether the doctrine of the Arizona Grocery case would bar reparations in any event. The other is for how many years before this action was filed—December 3, 1956 —the plaintiffs may recover the charges for unloading of which they complain and to that I address myself.

■ The answer depends upon the proper construction of § 16(3). Subdivision (b) provides that "all complaints against carriers * * * for * * * damages not based on overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after." Subdivision (c) provides "For recovery of overcharges action at law shall be be-

gun or complaint filed with the commission * * * within two years from the time the cause of action accrues, and not after." By virtue of subdivision (g) "overcharges" are confined to "charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the commission;" and it is common ground that this language does not cover the charges here involved. Until 1924 § 16(3) had been without subdivisions and had read that "all complaints * * * shall be filed with the Commission within two years [after] the cause of action accrues, and not after." This language is the same as that of subdivision (b), except that it omits the phrase, "not based on overcharges" which subdivision (c) now covers. In 1915 and again in 1923[3] the Supreme Court had held that a failure to make a claim for reparations within two years after the cause of action accrued put an end not only to any right to file a complaint with the Commission, but to commence an action at law. The claim ceased to exist; the phrase "and not after" helped to confirm that conclusion. In the first of these decisions the unreasonableness of the rate had been determined in another proceeding to which the plaintiff was not a party; in the second, the charge was an excess above the published rate.

The plaintiffs argue that when Congress in 1924 expressly distinguished in subdivision (c) between actions at law and complaints to the Commission, and left the old phrase "complaints * * * filed with the Commission" standing alone in subdivision (b), it must have meant to overrule these decisions and leave actions at law to recover reparations subject to the local statute of limitation, as had indeed been the common understanding before the decisions in question. Subdivision (c) was, however, confined to actions to recover "overcharges," as defined in subdivision (g)

3. A. J. Phillips Co. v. Grand Trunk Western Railway Co., 236 U.S. 662, 35 S.Ct. 444, 59 L.Ed. 774; Kansas City Southern Ry. Co. v. Wolf, 261 U.S. 133, 43 S.Ct. 259, 67 L.Ed. 571.

and it did not, and does not, cover the action at bar for "damages." That would perhaps not have been a complete answer to the implication that conceivably might be drawn from the variation in diction between subdivision (b) and subdivision (c), had there been no change in substance; but in 1924 the limit for "overcharges" was set at three years with an added six months, while the limit for "damages" was kept at two years. Had it been supposed that the change made by subdivision (c) was not confined to "overcharges," the amendment would certainly not have been left as it was. The very fact that the old form was kept as to all but "overcharges" is the strongest evidence that the two former rulings of the Supreme Court were to stand. Moreover, the reports in the House[4] and the Senate[5] clearly show that this was the only change intended; indeed the decisions, changing as they did the former understanding, were the cause of the amendment. It is to the last degree improbable that actions for reparations were to be left to the sport of the varying statutes of limitation of the states.

■■ So much for the claim based upon § 9 of the Interstate Commerce Act. The complaint also contains a count in indebitatus assumpsit, based upon the theory that the charges were unlawful and that their collection resulted in unjust enrichment. It is true that the Supreme Court held in Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 295, 296, 42 S.Ct. 477, 66 L.Ed. 943, that an action lay at common law against a carrier to recover any charge above the established rate; but that would not cover the situation at bar because the District Court would have no jurisdiction over the claim, both the plaintiffs and the defendant being citizens of the same state. For this reason the plaintiffs invoke the doctrine laid down in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct.

586, 77 L.Ed. 1148. However, it is obvious that in the view I take of the plaintiffs' rights, the Commission must in event pass upon the invalidity of the charges before the claim becomes absolute and is actionable at law at all. If, however, the action is stayed until the Commission decides that the charge was unlawful between December 3, 1954 and December 3, 1956, the recovery upon the common law count becomes subject to precisely the same conditions as the count under § 9. The period of limitation under this count is no greater than that under § 9, for, as I have said, § 16(3)(b) does more than bar an action; it puts an end to the claim by virtue of the clause, "and not after." A. J. Phillips Co. v. Grand Trunk Western Railway Co., supra, 236 U.S. 662, 667, 35 S.Ct. 444, 446, 59 L.Ed. 774: "the lapse of time not only bars the remedy, but destroys the liability * * * whether complaint is filed with the Commission or suit brought in a court of competent jurisdiction. * * * The obligation of the carrier to adhere to the legal rate, to refund only what is permitted by law and to that all shippers alike, would have made it illegal for the carriers, either by silence or express waiver, to preserve to the Phillips Company a right of action which the statute required to be asserted within a fixed period."

Judgment will be entered dismissing the count in indebitatus assumpsit, and staying judgment in the count under § 9 until the Commission has decided whether the unloading charge was "unjust and unreasonable" between December 3, 1954 and December 3, 1956. The plaintiffs will have sixty days from the entry of this judgment to file a complaint with the Commission under § 13(1); if they have not by that time done so, the complaint will be dismissed upon that count as well. Final judgment upon that count will await a consideration of the complaint before the Commission if the plaintiffs file one.

---

4. H.R.Rep. 706, 68th Cong., 2d Sess.

5. Sen.Rep. 286, 68th Cong., 1st Sess.

Settle judgment upon notice; this opinion will serve for findings of this court under Rule 52(a), 28 U.S.C.A.

On Submission of Conflicting Forms of Judgment.

 Section 16(3) (e) of the Interstate Commerce Act, 49 U.S.C.A. § 16 (3) (e) provides that the "cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after." As I have already said, the phrase, "and not after," is held to put an end to the "cause of action" after the statutory period for suit expires. Hence a separate claim arises, whenever a carrier collects an unlawful charge for the delivery of each "shipment of property."[1] Hence, although Fed.Rules Civ. Proc. Rule 20(a), 28 U.S.C.A. did of course allow the plaintiffs to join in one count their claims for the separate unloading charges, those collected—certainly those collected on separate days—created separate "causes of action" and the judgment dismissing so much of the complaint as was for "unloading charges" before December 3, 1954, is a "final judgment upon one or more but less than all of the claims" for relief alleged in that count. Rule 54b. I hereby make a "determination and direction" that "there is no just reason for delay" in entering judgment denying such of the claims, collectively as are embraced in the 13th, 14th and 15th articles of the complaint, and arose between the 1st day of November, 1948 and third of December, 1954. I do this because otherwise when the Interstate Commerce Commission has passed upon the period after December 3, 1954, there will have to be a second inquiry if I am reversed as to the statute of limitations.

I am therefore signing the judgment prepared by the defendant.

1. United States v. Standard Oil Co. of New York, D.C.1911, 192 F. 438.