685 F.2d 255
 IOWA BEEF PROCESSORS, INC., a Delaware corporation, Appellee,
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, a Delaware
corporation, Appellant.
IOWA BEEF PROCESSORS, INC., a Delaware corporation, Appellee,
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY, a Delaware
corporation, Appellant.
 Nos. 81-1640, 81-2357.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1982.
Decided Aug. 23, 1982.
Rehearing and Rehearing En Banc Denied Oct. 22, 1982.
 
 Frank W. Davis, Jr., Marc P. Franson, Gamble, Riepe, Burt, Webster & Davis, Des Moines, Iowa, for appellant Illinois Central Gulf R. Co.
 D. Douglas Titus, Bikakis, Titus, Vohs & Storm, Sioux City, Iowa, and Eugene D. Anderson, Washington, D. C., for appellee Iowa Beef Processors, Inc.
 Before BRIGHT and McMILLIAN, Circuit Judges, and HARRIS,* Senior District Judge.
 BRIGHT, Circuit Judge.
 
 
 1
 Illinois Central Gulf Railroad Co. (ICG) appeals from two orders of the district court, awarding Iowa Beef Processors, Inc. (IBP), $67,300.54 in damages for lost meathooks, plus prejudgment interest, and $15,594.57 in attorneys' fees. Because we agree with ICG's contention that this action falls within the primary jurisdiction of the Interstate Commerce Commission (ICC), we vacate these orders and remand this action for further proceedings in accord with this opinion.I. Background.
 
 
 2
 ICG, a common carrier engaged in interstate transportation, provided trailer on flat car (TOFC), or "piggyback," rail service to IBP. From January 1, 1976, through November 11, 1977, ICG transported 6,104 TOFC trailerloads of carcass beef shipped by IBP. Federal law requires elevation or suspension of carcass beef by meathooks or similar appliances, to prevent adulteration of the meat in transit. See 9 C.F.R. § 325.1 (1980).[1]
 
 
 3
 ICG furnished trailers to IBP with racks for the suspension of carcass meat by meathooks. The trailers did not, however, always contain an adequate number of meathooks for IBP to load a standard shipment of carcass beef.[2] Sometimes ICG supplied IBP with trailers that contained no meathooks at all.
 
 
 4
 On occasion, IBP requested additional hooks from ICG to make up the deficiency on trailers that lacked hooks. ICG responded by furnishing hooks to IBP, which IBP kept in a stockpile. IBP also added its own meathooks to the stockpile, and kept account of their respective contributions. When an ICG trailer did not have enough hooks for a shipment, IBP took hooks from its "hook bank," first subtracting the number drawn from the total for which IBP had credited ICG, and any excess from the number IBP itself had supplied. Similarly, IBP added any excess hooks to the stockpile and credited the donor accordingly.[3] IBP sent regular, monthly "hook statements" to ICG documenting the number and kind (short or long) of meathooks each had supplied to ICG trailers.
 
 
 5
 At the cessation of ICG's service, IBP's records indicated that IBP had provided a net 66,926 long meathooks that it never recovered, and that IBP retained 7,061 short meathooks provided by ICG. On June 21, 1978, IBP demanded that ICG return the hooks or pay IBP their fair value. When ICG failed to do either, IBP instituted this action. ICG denied liability for the meathooks, alleging that IBP had gratuitously supplied them for its own convenience, and that IBP or its consignees bore the responsibility for any loss or damage to meathooks.
 
 
 6
 The district court ruled in favor of IBP, on the ground that ICG had a duty to furnish meathooks as "instrumentalities and facilities" of the transportation of carcass meat. The court determined that the rates ICG charged IBP pursuant to the applicable tariff reflected the cost to the carrier of providing meathooks, noting also that ICG had recognized such a duty in the past by providing IBP with meathooks. The court concluded that ICG failed in its duty to provide IBP with a sufficient number of meathooks, and thus ICG had not complied with sections 1(4) and 1(5) of the Interstate Commerce Act, 49 U.S.C. §§ 1(4), 1(5) (1976) (the Act), which require carriers to charge "just and reasonable rates." After determining that the rates ICG charged pursuant to its tariff filed with the ICC reflected the cost of providing meathooks, the court ruled that IBP had a valid claim against ICG for the value of the meathooks IBP supplied that were never returned. Based on the parties' stipulation as to the number and value of meathooks at issue, the court awarded IBP $67,300.54.[4]
 
 
 7
 After a separate hearing, the district court ruled that IBP had sustained damage in consequence of a violation of the Interstate Commerce Act, and awarded IBP $15,594.57 in attorneys' fees, pursuant to 49 U.S.C. § 8.[5] The court also awarded IBP prejudgment interest at the rate of ten percent per annum based on section 553.3 of the Iowa Code, with interest accruing from the date IBP commenced the action.
 
 
 8
 ICG appeals from both orders, contending that (1) the district court did not have jurisdiction, because the case does not "arise under" the Interstate Commerce Act; (2) the case falls within the primary jurisdiction of the ICC; (3) the district court erred in concluding that ICG had a duty under the tariff to furnish meathooks for the transport of carcass beef, because the tariffs require only "transportation of and return to origin point" of meathooks; (4) ICG had no duty to return IBP's meathooks, because ICG had no responsibility for the contents of the shipments after delivery of the sealed trailers to IBP's consignees; (4) the district court erred in concluding that IBP had complied with the requirements of 49 U.S.C. § 20(11) (the Carmack Amendment) governing damage suits; and (5) the court erred in awarding attorneys' fees because any damages to IBP were not "sustained in consequence of" a violation of the Interstate Commerce Act.
 
 
 9
 We agree with ICG that this controversy falls within the primary jurisdiction of the ICC, and therefore we do not consider ICG's challenges to the district court's ruling on the merits.
 
 
 10
 II. Discussion.
 
 
 11
 A. Federal Jurisdiction.
 
 
 12
 The district court determined that "sections 1(3), 1(5), 1(6) and 1(11) (of the Interstate Commerce Act) lie at the center of plaintiff's complaint and the remedy sought(,)" and that section 20(11) "is tied into this matter." Iowa Beef Processors, Inc. v. Illinois Central Gulf Railroad, C78-4057, slip op. at 4 (N.D.Iowa May 22, 1981). On this basis, the district court concluded that it had jurisdiction pursuant to 28 U.S.C. § 1337,[6] which gives district courts original jurisdiction for proceedings "arising under any act of Congress regulating commerce."
 
 
 13
 ICG challenges the district court's determination that this controversy "arises under" the cited sections of the Act on the ground that IBP's complaint refers to the Act only in its description of ICG as a common carrier pursuant to the Act and tariffs filed thereunder. We note, however, that IBP based its claim on an allegation that ICG had failed in "its duty to provide equipment suitable for the transportation of carcass meat." Iowa Beef Processors, Inc. v. Illinois Gulf Central Railroad, C78-4057, amended complaint at 3 (N.D.Iowa Oct. 2, 1978) (emphasis added).
 
 
 14
 This court need not now determine whether any of the sections of the Act cited by the district court imposed a duty on ICG to supply IBP with meathooks for the shipment of carcass beef. We conclude, nevertheless, that such a duty, if any, derives from the Act, the tariff filed thereunder, and federal regulations governing transportation of animals and animal products. Accordingly, we agree with the district court that this case falls within its original jurisdiction pursuant to 28 U.S.C. § 1337.
 
 
 15
 B. Primary Jurisdiction.
 
 
 16
 Although we believe this controversy stems from a claim enforceable by original judicial action in federal district court, we nevertheless conclude that the district court improperly exercised its jurisdiction in this matter. The Supreme Court has held that the ICC has primary jurisdiction over any matter that "raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act." United States v. Western Pacific Railroad, 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Thus, even when an issue is initially cognizable by the district court, the doctrine of primary jurisdiction suspends the judicial progress pending referral of the matter to the appropriate administrative agency for its ruling. Id. at 64, 77 S.Ct. at 165.
 
 
 17
 Although "(n)o fixed formula exists for applying the doctrine of primary jurisdiction(,)" id., the Court has invoked the doctrine in deferring to the expertise of agencies and to promote uniformity within a particular area of federal regulation.
 
 
 18
 Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure. (Far East Conference v. United States, 342 U.S. 570, 574-75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).)
 
 
 19
 In this case, the district court awarded damages to IBP based on its determination that ICG had a duty to provide meathooks to IBP for the shipment of carcass beef "under its obligations to provide transportation, suitable equipment and facilities of carriage and car service." Iowa Beef Processors, Inc. v. Illinois Central Gulf Railroad, supra, slip op. at 4. As support for this conclusion, the district court cited the federal regulation requiring elevation of carcass beef during shipment. See 9 C.F.R. § 325.1, and n.1 supra, and section 1(3) of the Act, which provides in part:The term "transportation" as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported. (49 U.S.C. § 1(3)(a) (1976) (emphasis added).)
 
 
 20
 Reasoning that meathooks are essential to the shipment of carcass beef, the court concluded that they are an "instrumentality and facility" of the shipment. Iowa Beef Processors, Inc. v. Illinois Central Gulf Railroad, supra, slip op. at 5.
 
 
 21
 Because the Act does not define the terms "instrumentalities and facilities," however, the district court relied on Meat & PHP, TOFC, SWL, WTL, Official Territories, 340 I.C.C. 214 (1970) (Meat ), as support for its conclusion. In Meat, the ICC reviewed rates proposed by a group of railroads and considered, inter alia, whether higher cost to carriers of shipping suspended meat justified the higher rates over those charged for shipments of boxed meat. The district court interpreted the ICC's ruling in Meat as follows:
 
 
 22
 In examining the rates, the Commission examined the components of the rates, which included the cost of trailers equipped with meat hooks. Because the Commission broke down the components of the rates and specified the additional cost incurred by the carrier in equipping a trailer with meat hooks, the Commission acknowledged that the cost of the meat hooks was a legitimate part of the rate to be paid on the shipments of carcass beef. Defendant was a party to the Meat case and the tariff series in this matter was one of the tariffs involved in the Meat case. Accordingly, defendant and plaintiff are bound by the ruling in the Meat case.
 
 
 23
 Because the Commission's ruling in the Meat case included and encompassed the tariffs governing the ICG TOFC service on carcass beef involved in this matter, said tariffs included the cost of such hooks used and unreturned to IBP. Accordingly, ICG had a duty to IBP to provide hooks for the shipment of IBP carcass beef. This duty arises from the tariff ICG filed with the Commission. (Iowa Beef Processors, Inc. v. Illinois Central Gulf Railroad, supra, slip op. at 5-6.)
 
 
 24
 The district court properly considered whether the ICC had ruled that TOFC carriers had a duty to provide meathooks for shipments of carcass beef, inasmuch as this issue raises questions of transportation policy falling within the primary jurisdiction of the ICC. We do not, however, agree with the district court's interpretation of the ICC's ruling in Meat.
 
 
 25
 In determining whether the carriers' newly published rates were too high for the services rendered, the ICC made a rather extensive cost analysis, and ultimately approved all but one of the proposed plans. The ICC did not, however, approve the rate differential for suspended meat on the ground that the higher rate reflected the carriers' cost of providing meathooks. The ICC attributed the higher rates for shipments of suspended meat to higher loss and damage claims for suspended meat, and to the economies resulting from the higher minimum shipment weight applicable to shipments of other than suspended meat. Meat, supra, 340 I.C.C. at 242. At the same time, the ICC noted that shippers had protested the higher rates for suspended meat on the ground that shippers often incurred costs for hooks and racks, because the railroads did not uniformly supply meathooks. Id. at 255, and 303. Thus, the district court read more into the Meat ruling than the language of that opinion justifies. Meat does not resolve the question of whether the carriers have assumed a duty to supply meathooks for TOFC service.
 
 
 26
 Whether ICG has assumed such a duty should be determined in the first instance by the ICC. The doctrine of primary jurisdiction requires the court to refer the matter to the ICC when, as here, the claim presented to the court requires an inquiry into the lawfulness of a carrier's practice, General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 431-32, 60 S.Ct. 325, 330-31, 84 L.Ed. 361 (1940), or when problems of cost allocation are relevant to and intertwined with the issue of tariff construction, United States v. Western Pacific Railroad, supra, 352 U.S. at 69, 77 S.Ct. at 167. Likewise, cases such as this, which turn on questions of the parties' respective duties to furnish specialized equipment, fall within the primary jurisdiction of the ICC. See General American Tank Car Corp. v. El Dorado Terminal Co., supra (amount of reasonable allowance due to shipper for furnishing specialized form of freight car for transport of its product falls within primary jurisdiction of ICC); Loomis v. Lehigh Valley Railroad, 240 U.S. 43, 36 S.Ct. 228, 60 L.Ed. 517 (1916) (whether carrier had duty to furnish lumber for bulkheads used in shipping grain falls within primary jurisdiction of ICC); Midland Valley Railroad v. Excelsior Coal Corp., 86 F.2d 177 (8th Cir. 1936) (whether railroad had duty to furnish open-top cars for wagonloading of coal falls within primary jurisdiction of ICC).
 
 
 27
 The question of which party has a duty to provide a particular service or equipment directly implicates the ratemaking process, and, therefore, application of the doctrine of primary jurisdiction requires reference to the ICC. In Armour & Co. v. Alton Railroad, 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771 (1941), the Supreme Court acknowledged the complex questions of transportation policy that underlie such an issue.
 
 
 28
 The railroad is entitled to receive and the shipper is required under the statute to pay a just and reasonable rate. A court judgment in favor of petitioner would reduce the compensation of the railroads for the performance of their services, and would in effect constitute a readjustment of their rate schedules. (Id. at 201, 61 S.Ct. at 502.)
 
 
 29
 We believe that the doctrine of primary jurisdiction dictates that the ICC should determine, in the first instance, whether ICG had a duty to furnish a shipper of carcass beef with a full complement of meathooks for a standard load. Accordingly, we vacate both orders of the district court and remand this cause for further proceedings and reference to the Interstate Commerce Commission in conformity with this opinion.
 
 
 
 *
 Honorable Oren Harris, United States Senior District Judge, Eastern & Western Dist. of Ark., sitting by designation
 
 
 [1]
 9 C.F.R. § 325.1 provides in part:
 (c) No person, engaged in the business of buying, selling, freezing, storing, or transporting, in or for commerce, meat or meat food products capable of use as human food, or importing such articles, shall transport, offer for transportation, or receive for transportation in commerce or in any State designated under § 331.2 of this subchapter, any such meat or meat food product which is capable of use as human food and is not wrapped, packaged, or otherwise enclosed to prevent adulteration by airborne contaminants, unless the railroad car, truck, or other means of conveyance in which the product is contained or transported is completely enclosed with tight fitting doors or other covers for all openings. In all cases, the means of conveyance shall be reasonably free of foreign matter (such as dust, dirt, rust, or other articles or residues), and free of chemical residues, so that product placed therein will not become adulterated. Any cleaning compound, lye, soda solution, or other chemical used in cleaning the means of conveyance must be thoroughly removed from the means of conveyance prior to its use. Such means of conveyance onto which product is loaded, being loaded, or intended to be loaded, shall be subject to inspection by an inspector at any official establishment. The decision whether or not to inspect a means of conveyance in a specific case, and the type and extent of such inspection shall be at the Program's discretion and shall be adequate to determine if product in such conveyance is, or when moved could become, adulterated. Circumstances of transport that can be reasonably anticipated shall be considered in making said determination. These include, but are not limited to, weather conditions, duration and distance of trip, nature of product covering, and effect of restowage at stops en route. Any means of conveyance found upon such inspection to be in such condition that product placed therein could become adulterated shall not be used until such condition which could cause adulteration is corrected. Product placed in any means of conveyance that is found by the inspector to be in such condition that the product may have become adulterated shall be removed from the means of conveyance and handled in accordance with § 318.2(d) of this subchapter. (9 C.F.R. § 325.1(c) (1980).)
 
 
 [2]
 IBP had communicated to ICG its need for 180-200 long hooks and 80-100 short hooks for a "standard load" of carcass beef
 
 
 [3]
 The parties stipulated that the meathooks at issue in this case are fungible, necessitating this kind of internal recordkeeping. Because the hooks have no distinguishing marks, the respective owners could not identify any particular hook after placing them in service
 
 
 [4]
 The court calculated the damage award on the basis of a summary report prepared by IBP indicating that IBP had a net deficit of 66,926 long meathooks, and ICG had a deficit of 7,061 short hooks. The parties stipulated that, as of June 21, 1978, the fair market value of a long hook was $1.09 and a short hook was $.80
 
 
 [5]
 49 U.S.C. § 8 provides:
 In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case. (49 U.S.C. § 8 (1976).)
 
 
 [6]
 28 U.S.C. § 1337 provides in pertinent part:
 (a) The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies: Provided, however, That the district courts shall have original jurisdiction of an action brought under section 20(11) of part I of the Interstate Commerce Act (49 U.S.C. 20(11)) or section 219 of part II of such Act (49 U.S.C. 319), only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs. (28 U.S.C. § 1337(a) (Supp. IV 1980)].